Smith *v*. Nelson.

George Smith, Treasurer of the Associate Congregation of Ryegate *v*. John Nelson, Administrator *de bonis non*, with the will annexed, of William Nelson.

In Chancery.

A voluntary association, or society, for the purpose of supporting religious worship, may, under the constitution and laws of this State, receive and hold a legacy.

A legacy to such society, "the interest thereof to be annually paid to their minister forever," is to be considered as a gift, or grant, to the society; and the only inquiries to be made, in determining their right to receive the legacy, are, whether the society still exists, and whether they have a minister, chosen and appointed by the *majority*, and regularly ordained over the society, agreeably to the usage of the denomination, or church, to which they profess to belong. And in this view the society have a right to elect such minister, as they think proper.

And this right of the *majority* is to be recognized, unless the terms of the bequest are so explicit as to control the right.

And the relation of the minister, thus chosen and ordained, is not to be dissolved, against the will of the minister and of a majority of the congregation, by the proceedings of any ecclesiastical tribunal.

Although religious denominations, in this State, may form constitutions, enact canons, laws, or ordinances, establish courts, or make any decisions, decrees, or judgments, yet they can have only a voluntary obedience, can-

Smith *v.* Nelson.

not affect any civil rights, immunities, or contracts, or alter, or dissolve, any relations, or obligations, arising from contracts. Obedience to their requirements may be exacted, under the penalty of spiritual censures; but whether one submits to, or defies, their proceedings, depends on his conviction of their regularity, or irregularity; they can only affect his conscience. And when their proceedings are to be examined by ordinary tribunals of justice, they can receive no other consideration, than the regulations of any other voluntary associations.

Although these voluntary associations frequently make constitutions and pass by-laws, which they declare are not to be altered, except in a certain manner, yet their constitution and laws may at any time be altered, or abrogated, by the same power which created them; and the vote of any subsequent meeting, abrogating or altering such constitution, though passed only by a majority, has as much efficacy, as a previous vote establishing them.

There cannot, in this country, be claimed for the decisions of a synod, or of any ecclesiastical judicatory, the same effect, which is given to the decision of ecclesiastical courts in England.

Nothing can be added by implication to the express terms of the contract between a minister and his people. The parties may make conditions and qualifications, as they deem necessary. When a minister ceases to be able to perform his ministerial duties, in consequence of any immorality, or a church censure for such immorality, it may afford a sufficient reason for the parties mutually to dissolve the relation, or for one of them to treat the contract as forfeited and rescinded by the other. But when both parties to the contract are satisfied, and *neither* desires the relation to be dissolved, a court of chancery will not, at the instance of others, not parties to the contract, seek for implications, by which to avoid it, nor inquire whether it would conduce to the satisfaction of others to have a minister more closely connected with the denomination, to which he belongs.

The Presbyterian "*Associate Church*" was founded on the principle, that it is both the right and the duty of members to secede from the prevailing party, who may obtain a majority in the judicatories, synods and assemblies, when, in the opinion of the seceders, such majority have departed from the word of God and the received and approved standards of doctrine, worship, government and discipline. Therefore, when a congregation and their minister thus secede, no violation of any implied contract between the minister and the congregation is involved, which will justify a court of chancery in treating the connection between them as dissolved,—especially when the majority of the congregation do not complain of any such violation.

Where a testator made a bequest in these words,—"As a testimony of my gratitude to the giver of every good and perfect gift, I farther will and de-

vise the sum of one hundred and fifty dollars as a donation to the ' Associate Congregation of Ryegate,' to be placed under the direction of the trustees of said society, and the interest thereof to be annually paid to their minister forever," it was held, that there was nothing in the terms of the bequest, which indicated that the testator had any regard to the connection of the congregation with any other body, or to any future divisions, which might occur in the congregation, and that it could therefore have no effect, in determining the right to the legacy, that the congregation had seceded from the "Associate Church," to which it belonged at the time of the testator's decease.

The procedings of the synod of the "Associate Church," as a court of the last resort, are not to be held conclusive and absolute, in this country, when they come in question, whether directly, or collaterally, in courts of law; but the regularity and effect of their proccedings may be examined and be determined, in courts of justice, upon the same principles, which subject the proceedings, either of inferior courts, or voluntary associations, to inquiry and adjudication.

Where a minister, having stated that certain members of the presbytery, to which he belonged, were unfit to sit in any court, was, by vote of the presbytery, censured and suspended, and the vote was passed by the very men, as to whom the statement was made, it was held, that the sentence of suspension could not be said to be pronounced by impartial judges, and that it was not deserving of consideration, as a valid and effectual sentence.

And the congregation, to which the suspended minister belonged, having petitioned the presbytery again to take into consideration the affair, and a *pro re nata* meeting of the presbytery being called, at which there was a full attendance and a majority of two in favor of restoring the minister, and a resolution having been offered, that two of the members should be excluded from participating in the proceedings of the meeting on the ground of affinity and partiality, and the right of voting on the case of each separately, although they were entirely distinct in their nature, being denied, and so both prevented from voting upon the resolution, and the resolution being then passed by the casting vote of the moderator, the same four members, who were the accusers of the suspended minister, voting in the affirmative, and it now appearing, that there was in fact no proper objection to one of the two members, thus excluded, and the presbytery, a majority being thus obtained, having proceeded and voted to affirm the sentence of suspension, the same four persons voting in the affirmative, it was held, that these proceedings rendered the sentence of the presbytery utterly void.

The synod has power to erect new presbyteries; but no power is given to them to dissolve a presbytery, against its consent.

And where the synod declared a presbytery dissolved, and, upon its not submitting to the decision, deposed the ministers who constituted it, it was held, that the decree was void, and that the ministers were unlawfully deposed.

Where a complaint is preferred to the synod against a presbytery, it is irregular for the synod to attempt to pass upon the matter, or give any opinion in the case, without giving the presbytery notice to appear before them; and if they do thus proceed, their authority to sit in the case, after this, as a court, might, with the strictest propriety and according to the rules of justice, be declined.

The synod have no power to appoint a commission to receive the submission of a presbytery, which has been on trial before the synod, and to restore, or dissolve, the presbytery, as the commissioners may think proper. This is a delegation of judicial power, not warranted by any known rules of discipline in the "Associate Church."

Neither have the synod power to suspend, or depose, ministers, except in cases which come to them by appeal from the presbytery, where such matters must commence and be first determined.

Where a legacy is bequeathed to a voluntary religious association, to be placed under the direction of the trustees of the association, and the interest to be annually paid to their minister forever, the treasurer of the association may institute a suit in chancery in their behalf, if the suit is recognized by them, to enforce a fulfilment of the bequest. But, if a suit were so instituted, and there were any difficulties upon this point, the decree might be so framed as to obviate them.

And the court, in such case, will not commit the execution of the trust to persons claiming to be trustees of the association, but whose election is shown to have been secured by improper and perhaps illegal means, and who are evidently hostile to those, for whose benefit the legacy is to be secured.

APPEAL from the court of chancery. The orator alleged in his bill, that, so long ago as the year 1790, divers persons, residing in Ryegate and its vicinity, formed themselves into a voluntary association, by the name of the Associate Congregation of Ryegate, for the purpose, among other things, of promoting the preaching the gospel and hiring and supporting a minister in Ryegate; that the society then organized by electing sundry officers, viz., a moderator, clerk, treasurer and collector, and have from year to year, ever since that time, kept up their organization by holding meetings and

Smith *v.* Nelson.

electing officers ; that at a meeting of the society, holden at Rye-
gate on the sixteenth day of March, 1842, the orator was duly elect-
ed treasurer of the society, accepted the appointment, and acted as
treasurer from that time until the bringing this bill, and now prose-
cutes this bill in behalf of himself, as well as of the other members,
the society being unincorporated ; that the society, during most of the
time since its organization, had supported a minister of the gospel,
and especially, since the year 1828, they had had such minister, who
had constantly officiated in that capacity, and who had been suppor-
ted by the society, but whose salary, at the time of bringing the bill,
was alleged to be greatly in arrear by reason of the withholding of
the legacy hereinafter mentioned.

The orator farther alleged, that William Nelson, late of Ryegate,
deceased, who was, during his life, a member of the society, and
paid annually to the society, the sum of nine dollars, towards the
support of their minister, on the twenty ninth day of September,
1830, made and published his last will and testament, therein devis-
ing the sum of one hundred and fifty dollars, as a donation to the
Associate Congregation of Ryegate, to be placed under the direc-
tion of the trustees of the society, and the interest thereof to be an-
nually paid to their minister forever, and appointed James Nelson,
Jr., and Robert Nelson his executors ; that William Nelson died
on the twenty fourth day of January, 1831, without revoking or can-
celling this will ; that the will was duly proved in the probate court,
and the probate affirmed by the supreme court, on appeal ; that the
executors refused to pay the yearly interest of the legacy to the
society, except the interest for the two first years after the decease
of William Nelson, although they received more than sufficient
property of the estate to pay all demands against it, including ex-
penses of administration ; that subsequently James Nelson, Jr., died,
and Robert Nelson was discharged from his trust as executor, and
the defendant, on the twenty third day of March, 1841, was duly
appointed administrator *de bonis non*, with the will annexed, of the
estate of William Nelson, and accepted the trust and gave bonds ;
that the defendant, though repeatedly requested to pay to the con-
gregation the accrued interest on the legacy, refused to do so ; and
that, on the tenth day of March, 1842, the defendant settled his ad-
ministration account in the probate court, and was allowed, in the

settlement, the amount of the legacy and a large amount of interest thereon, and that the defendant still refused to surrender the legacy and interest, to be disposed of according to the terms of the bequest.

And the orator prayed, that an account of the arrears of interest upon the amount of the legacy might be taken, and that the defendant might be ordered to pay the amount of the legacy to such suitable persons, as trustees, to take care of and manage the same, as the court of chancery might appoint, according to the true intent of William Nelson, as expressed in his will, under such regulations as might be deemed proper by the court.

The defendant answered, that on the seventh day of October, 1823, there was a church in Ryegate, of the presbyterian denomination, under the pastoral charge of Rev. Thomas Farrier, who was regularly ordained and installed as such pastor in September, 1822, according to the rules of the denomination; that this church had been in existence for several years previous, but had been without regular preaching until that time; that the church was formed for religious purposes and in the same way and manner that all other churches of that denomination are formed, and in no other way and for no other purpose; that said church was usually called " The Associate Society, or Congregation, of Ryegate," for the reason that all churches, or congregations, of this denomination, are called associate by the denomination, but that it had no peculiar name, and no officers, except such as were common to other churches of presbyterians.

The defendant farther answered, that for a short time previous to October 7, 1823, the church in Ryegate contemplated purchasing a piece of land, whereon to build a meeting house, and had the promise of a donation in land from one James Henderson, and also the promise from William Nelson, deceased, that, at his death, he would leave the sum of one hundred and fifty dollars in the hands of trustees, the interest to be for the benefit of the church; that, on consultation, the members of the church concluded, that a society should be formed of its male members, which should have by-laws, and officers, to be annually elected, and, among other officers, a board of three trustees, for the purpose of holding such land, and the donation from William Nelson, and other property, which the society

might own, and hold and manage it for the society ; that this plan was suggested by William Nelson, who was active in procuring its adoption and fully approved of it for the purposes named ; that such society was accordingly formed, on the seventh day of October, 1820, by certain members of the church signing articles of association in these words ;—" We, the subscribers, inhabitants of Ryegate, do hereby voluntarily associate, and agree to form a society, by the name of ' The Associate Society of Ryegate,' for the purpose of holding land, or other property, either by purchase, or donation, whereon to build a meeting house, or house for the minister, or other donation of land, or property, for the benefit of the society;" that this society at first consisted of twenty one members, but subsequently increased, until it embraced nearly all the male members of the church; that by-laws were adopted by the society in February, 1824, of which the second article was in these words ;—" The standing officers of the society shall be, or consist of, three trustees, a clerk, and treasurer, all of whom shall be annually chosen, by ballot, from among the members of the society and sworn to the faithful discharge of their respective offices, and shall hold their offices until their successors are chosen and qualified ; " that, immediately after the by-laws were adopted, the society chose its first officers, of whom this defendant, Andrew Warden and Alexander Henderson were trustees ; that the society has been kept organized since that time, with the officers required by the by-laws, and this defendant had been, nearly all the time, one of the trustees ; that the officers, chosen at the last election preceding the filing of the bill in this case, were John Gibson, Alexander Gibson and this defendant, trustees, Robert Gibson, 2d, treasurer, and William Gray, clerk ; and that the officers of the society, since its formation, have discharged their duties faithfully, and to the satisfaction of the church and society, and that each of the present board of trustees is amply responsible, in point of property.

The defendant farther answered, that four different parcels of land have been, at different times since the formation of the society, deeded to the 'trustees ; that William Nelson made his will on the twenty ninth day of September, 1830, which contained a bequest in these words ;—"As a testimony of my gratitude to the giver of every good and perfect gift, I farther will and devise the sum of one hun-

dred and fifty dollars, as a donation to the Associate Congrega-
tion of Ryegate, to be placed under the direction of the trus-
tees of said society, the interest thereof to be annually paid to the
minister forever ;" that William Nelson, at the time of his death
and for many years previous, was a member of the church in Rye-
gate, and a firm believer in presbyterianism, and in the principles
of faith and forms and rules of church government and dicipline,
which distinguish it from other christian denominations ; that exec-
utors were appointed, and the defendant subsequently appointed ad-
ministrator *de bonis non,* with the will annexed, as stated in the bill ;
that the defendant settled his administration account in the probate
court, May 10, 1842, and was then allowed the amount of the leg-
acy, $150,00, and $72,00 for the accrued interest thereon, and that
he paid both said sums to the trustees of the society, and took their
receipt therefor ; that the legacy had ever been holden by him and
by the executors, subject to the order and direction of the trustess,
by express agreement made with them by James Nelson ; and that he
verily supposed, that it was his duty, by the terms of the will, to pay
the legacy and interest to the trustees, and that the care and man-
agement of the fund belonged to them, and that he did not know,
or suppose, that it was his duty to pay the same to any other person,
and that he made the payment in good faith.

The defendant farther answered, that about the year 1827 the
connection of Rev. Mr. Farrier with the church in Ryegate was reg-
ularly dissolved ; that the church remained vacant for a few years,
and then the Rev. William Pringle was installed as its pastor, and so
continued until the year 1840, when, for causes herein after stated,
he was regularly suspended from the exercise of the ministry and com-
munion of the church by the Associate Synod of North America,
the highest court known to the presbyterian church in this country
in matters of church discipline, and was, in consequence thereof,
afterwards, by request of the church, removed from its pastoral
charge by the presbytery of Cambridge, to which the churches in
Vermont belonged ; and that the church since that time, has been
without a regular pastor.

The defendant also set forth the form and mode of presbyterian
church government and discipline, and the manner of calling, exam-
ining and ordaining ministers of that denomination, substantially as

follows. For church government and discipline all presbyterians recognize three church courts, viz., the " sessions," " presbytery " and " synods," and that a regular subordination of those courts, to wit, of sessions to presbyteries and of presbyteries to synods, is essential and taught in the scriptures. Each particular church, or congregation, has its sessions,—consisting of the pastor, when that place is supplied, and the ruling elders; each church also has its deacons; deacons and ruling elders are elected by the members and ordained. These are all the officers known to the churches, or congregations, as such; churches have no moderators, and the church at Ryegate has none; neither has that church, nor any other in the denomination, a treasurer, or collector, except that, in particular cases, the church appoints individuals in different sections, when necessary, to receive from subscribers the sum they pay the pastor; sometimes, also, for the time being, a treasurer is appointed; but these officers are only appointed in particular cases, for convenience. Each sessions has its clerk, chosen, not annually, but during the pleasure of the sessions; and the pastor is also its standing moderator, or, when there is no pastor, another person is called to preside. Ruling elders are elected, when the sessions decide such election to be necessary, or, if there is no pastor, by appointment of the presbytery. The connection of pastors with congregations is considered by presbyterians as an important one, and requires considerable formality and ceremony. When a congregation wish for a pastor, they petition their presbytery to appoint some one to preside at the moderation of a call. If the presbytery approve the petition, after examining the condition and prospects of the church, they appoint one of their members to preside, who calls a meeting of the church, explains its object, and, after prayer, calls upon the members to vote for the person they would *call;* when any one has a majority of the votes, a blank form for a call is produced and filled up and signed by the voters and forwarded to the presbytery, for their consideration, as also the certificate of the member of the presbytery, who presided;—this is termed moderating a call. If the presbytery approve the call, the person called is consulted; if he accepts, a member of the presbytery is appointed to conduct the ordination and installation. This member calls a meeting of the church, with notice for any one to object, who chooses, and, if no objections are

Smith *v.* Nelson.

made, when the day arrives, he presides at the meeting, preaches a sermon, and publicly, in the presence of the whole congregation, proceeds to examine the candidate, and propounds to him a number of questions, relative to his belief in the doctrines of the presbyterian church and the correctness of its modes of discipline, and his willingness at all times to submit himself to the decisions of its tribunals.*  If the result of the examination is satisfactory, the candi-

---

*The questions thus propounded to the candidate for ordination are set forth at length in the answer of the defendant, and are as follows.

1. Do you believe the scriptures of the old and new testament to be the word of God and the only rule of faith and practice?  2. Do you believe and acknowledge the whole doctrine of confession of faith and catechisms, larger and shorter, agreed upon by the assembly of divines at Westminster, with commission from the church of Scotland, as these are received in the declaration and testimony, published in the year 1784 by the Associate Presbytery of Pennsylvania, now the Associate Synod of North America, to be the doctrine taught in the word of God; and are you resolved, through the grace of our Lord Jesus Christ, to maintain this, as a confession of your faith, against all contrary opinions?  3. Do you acknowledge presbyterial church government to be of divine institution, and appointed by Jesus Christ, the only head, king and law giver of the church, to continue in it to end of time; and do you adhere to the same, as stated " the form of Presbyterial Church Government and ordination of ministers, agreed upon by the assembly of divines at Westminster," and testified for by us; and are you resolved, by the Lord's assistance, to maintain and defend the same against all contrary opinion?  4. Do you adhere to the declaration and testimony of the Associate Synod of North America, for the doctrine and order of the church of Christ, and against the errors of the present time?  5. Do you acknowledge the perpetual obligation of the solemn covenant engagements we, in this church, are under, as these have been explained in the declaration and testimony of the Associate Synod of North America; and are you resolved, through grace, to endeavor faithfulness in adhering to the testimony maintained by the Lord's witnesses for these reformation principles we possess, in contending earnestly for the faith once delivered to the saints, and in attending to all those duties, which the Lord, in his word, has enjoined upon us, and which we, in this church, are, by these our covenant engagements, bound to perform?  6. Do you engage to submit yourself willingly and humbly, in the spirit of meekness, to the admonitions of this presbytery, as subordinate to the Associate Synod of North America, remembering, that, while they act uprightly, they judge not for men, but for the Lord, who is also with them in the judgment; and do you promise, that you will endeavor to maintain the spiritual amity and peace of this church, carefully avoiding every divisive course, neither yielding to those who have made defection from the truth,

Smith *v.* Nelson.

date is ordained and installed, and the whole proceedings are recorded in the presbytery's book ; and thus the relation of pastor to the church is formed.   The presbytery is under obligation to see that the pastor's salary is paid to him, and may dissolve the relation at pleasure.   To the sessions belongs the management of the spiritual government of the congregation, over which they preside, subject to appeal to the presbytery.   The sessions, in conjunction with the deacons, form a consistory, for the management of the temporalities of the church.   A presbytery consists of all the pastors within a given district and one ruling elder from each pastoral charge; members without charge, located within the bounds of the presbytery, are members, except that they may not vote, where the exercise of discipline is involved.   The presbytery receive and issue appeals from the sessions, also references, examine and license candidates for the ministry, ordain, install, remove and try ministers, organize congregations, resolve questions of order and discipline, condemn erroneous opinions, visit congregations, inquire into their state, redress evils within them, unite or divide them, and order

---

nor giving yourself up to a detestable neutrality and indifference in the cause of God; but you will continue stedfast in the profession of reformation principles, maintained by us and by our brethren of the Associate Synod in Scotland, and do nothing, directly or indirectly, to destroy our amity with them in the cause and work of God; and this you promise, through grace, notwithstanding any trouble, or persecution, you may be called to suffer in studying a faithful discharge of your duty in these matters ?   7.   Are you conscious, that you have used no undue methods, in procuring your call to the office of the holy ministry ?   8.   Do you engage, in the strength of our Lord and master, Jesus Christ, to rule well in your own family, and to live a holy and circumspect life, following after righteousness, godliness, faith, love, patience and meekness ?   9.   Do you promise, through grace, to perform all the duties of a faithful minister of the gospel, in preaching it, not with enticing words of men's wisdom, but in the purity and simplicity thereof, not ceasing to declare the whole counsel of God, as also in catechising, exhorting from house to house, visiting the sick, and performing whatever other duties are incumbent on you from the word of God, as a faithful minister of Jesus Christ, for the convincing and reclaiming of sinners and for the edifying of the body of Christ ?   10.   All these things you promise and engage unto, through grace, as you will be answerable at the coming of our Lord Jesus Christ, with all his saints, and as you desire to be found among that happy company, at his glorious appearing ?

whatever belongs to their spiritual welfare; they also keep records of their doings, subject to the inspection of the synod, to which they make annual reports; appeals also lie to the synod from their decisions. A synod is only a larger presbytery. It consists of all the ministers belonging to the several presbyteries, of which it is composed, with a ruling elder from each pastoral charge, or a delegation from each presbytery. The synod receive and issue appeals, regularly brought from the presbyteries, decide on references, review the records of the presbyteries, censure and redress whatever has been done in the presbyteries contrary to order, erect and dissolve presbyteries, judge in controversies respecting doctrine and discipline, warn and bear testimony judicially against error in doctrine and immorality in practice, and, in general, take care that inferior courts act in conformity with the word of God and the standards of the church.

The defendant farther alleged in his answer, that the church in Ryegate belonged to the presbytery of Cambridge until the year 1828, when that church and the church in Barnet were, by the synod, erected into a new presbytery, called the Associate Presbytery of Vermont, and so remained until July, 1840, when that presbytery was dissolved and the churches re-annexed to the Cambridge presbytery; and that the church in Ryegate ever has and still does belong to the Associate Synod of North America; that there are five degrees of church censure, which these tribunals may inflict, according to the circumstances of the case, to wit, admonition, rebuke, suspension, deposition and excommunication,—of which the fourth, deposition, is depriving a church officer of the office, with which he had been solemnly invested, at his ordination; that presbyterians, in this country, believe in the separation of the church, as such, from all matters of state, while the church, as such, acknowledge no other rules, or laws, but such as Christ has appointed, and that so the civil magistrate, as such, has no right to interfere in the administration of its government,—his duty, as such, respecting men, not as christians, but as members of civil society.

The defendant farther alleged in his answer, that Dr. Alexander Bullions, a teaching elder belonging to the presbytery of Cambridge, was, on the fifth day of October, 1837, for certain offences by him committed in the presence of the presbytery, first ordered to be

rebuked, and, not submitting to this censure, but persevering impenitently in the offences charged against him, was suspended from the exercise of the ministry and the communion of the church, until he should give evidence of repentance, and, for persevering in these offences, and for other grounds of charge, found against him in the progress of the cause, he was at length, on the twelfth day of April, 1838, deposed from the office of the ministry and suspended from the communion of the church, and, on protest and appeal taken, these decisions were confirmed by the synod, and Dr. Bullions was, by the synod, specially remitted to the presbytery of Cambridge, to which he formerly belonged, to be farther dealt with; that while things were thus, the presbytery of Vermont, then recently formed, at its first meeting, on application of Dr. Bullions, restored him to the office of the ministry and the communion of the church, and admitted him as a member of their body,—all which proceedings were disorderly, in disaffirmance and contempt of the authority of the synod, contrary to presbyterial rule, without authority, and null and void, being contrary to the rules, which forbid a church court from interfering with the deeds of a co-ordinate or superior court, by way of review, or reversal, which forbid the admission of a member to one presbytery, while he resides in the bounds of another and is under their care, for the reason, that the two ministerial members of the Vermont presbytery had been, by the synod, legally excluded from sitting, or acting, in Dr. Bullion's case, on account of affinity and partiality,—one being his brother in law and the other his son in law,—for the reason, that the evidence in the case was not before the presbytery, and the accusers of Dr. Bullions were absent, and were not cited to appear,—without which the court had no jurisdiction of the case,—and for the reason, that the deed of the Vermont presbytery, restoring Dr. Bullions, could not annul that of the presbytery of Cambridge, a co-ordinate jurisdiction, in whose care he was, and which had suspended and deposed him; that the synod, on being informed of the acts, above named, of the Vermont presbytery, declared them null and void, formed a charge against the presbytery for their conduct in the case, and suspended them, as a presbytery, from the exercise of presbyterial authority, and cited the presbytery to appear at the next meeting of the synod, which was early in the year 1840, to answer for their conduct; that

the presbytery, though regularly cited, refused to appear; that the case was brought on for trial, and the presbytery was sentenced to be rebuked, and it was decided, that they should submit to the synod's deed, declaring their act, restoring Dr. Bullions, null and void, and engage to abstain from farther communion with him, until regularly restored; that the synod also appointed a commission, to meet in Barnet in July following, to call the presbytery before them, take their answer, and execute the decision of the synod; that accordingly the commissioners met in Barnet, in July, 1840, the presbytery appeared before them and decided not to submit to the decision of the synod, and thereupon the commissioners dissolved the presbytery, suspended the ministers, Messrs. Pringle and Goodwillie, from the exercise of the ministry and communion of the church, until they should acknowledge their sin and return to their duty, and referred them to the presbytery of Cambridge for farther dealing, and placed their congregations under the care of the latter presbyry,—all which the synod specially authorized the commissioners to do; and that said Pringle and Goodwillie, not having acknowledged their sin, as required, have not been restored to the exercise of the ministry, or communion of the church.

The defendant farther alleged, that, at the time Rev. Mr. Pringle was suspended, in 1840, a part of the former members of the church countenanced him, and, in a disorderly manner, have employed him to preach to them, and, with three, only, of the eight ruling elders of the church, continue to support him, in open disregard of their former engagements and of the rules of church discipline,—but that they are a separate body, and meet alone; that the church at Ryegate, as such, including the majority of the sessions, have no fellowship, or communion, with Mr. Pringle, or his adherents, since his suspension; and that he is not now a minister of the Associate Congregation of Ryegate, and he and his supporters are not in regular standing in the church; that the church, since July, 1840, have had only occasional preaching, but have now made a new call for a pastor, which has been entertained by the presbytery, and has been accepted by Rev. Isaac Law; that the adherents of Mr. Pringle, of whom the orator is one, have endeavored to get control of the funds and property of the church, by carrying the annual elections, in the

society formed in 1823, for members of their own party, but have failed in their efforts, as the majority adhere to the church.

And the defendant denied, that the orator is treasurer of the church in Ryegate, or of the society formed in 1823, for choosing trustees, and alleged, that, if he is treasurer of any body, it is only by appointment of the supporters of Mr. Pringle, as a separate body, made in an irregular manner.

The defendant also averred, that on the ninth day of November, 1842, after the legacy and interest had been paid by him to the trustees, the trustees called on Mr. Pringle, and tendered to him so much of the interest, as accrued prior to July, 1840; but that he refused to receive it from them in their character of trustees, and that subsequently the same offer, with like result, was made to the legal counsel of Mr. Pringle.

The answer was traversed, and testimony was taken, the substance of which is sufficiently detailed in the arguments of counsel and the opinion of the court.

*A. Underwood* for orator.

The orators's right of recovery is clearly established, it is apprehended, unless the matters set up in defence shall prevail. The will of the testator, in regard to the legacy, is clear and unambiguous. The answer of the defendant admits assets. The whole testimony sufficiently shows the existence of the society and that the orator is treasurer. A demand of the legacy is shown, before the suit was commenced; and, upon the principles settled in the case of *Burr's Ex'rs* v. *Smith et al.*, 7 Vt. 241, the orator is entitled to a decree.

The court will have seen, by the testimony in the case, that, since the death of the testator, there has occurred a division in the Associate Church; that, in fact, there are now two synods, each professing and claiming to be the Associate Synod of North America. It will farther be seen, that the synod, to which the defendant adheres, embraces a greater number of congregations and presbyteries, than that to which the orator adheres. It will also be seen, that a *large majority* of the congregation of Ryegate adhere to the synod composed of the lesser number of presbyteries. The defendant claims, that that portion of the congregation, to which he belongs, is the true *Associate Congregation of Ryegate*, though a minority; that

they adhere to the principles, rules and constitution of the associate church, and particularly that rule, which requires absolute submission to the decisions of the church judicatories. He farther claims, that the orator and those with whom he is associated have violated these rules, and refused that submission to the decisions of the church courts, required by the presbyterial establishment, that they are under censure and therefore are not of the *associate church.* This is the issue tendered by the defendant; but the orator insists, that this is not the true issue in the case; for it must follow, that, if the cause is to be decided upon this issue, this court must resolve itself into an ecclesiastical tribunal, and examine the merits of those controversies, which have resulted in this division in the church, and determine them, not by the civil, but by the ecclesiastical law.

But we claim, in this view of the subject, that the *prevailing* party, in the associate synod, that was, are not the associate church, which existed at the death of the testator, that this prevailing majority have gone counter to and violated the principles of the associate church, and that the majority of the congregation of Ryegate, though they are in the minority of that synod, yet adhere to the whole presbyterial system, as it existed at the death of the testator, to the books of discipline, and the standards of the church, as they then existed, in opposition to innovations and corruptions of that prevailing majority, and therefore are the Associate Congregation of Ryegate, to whom the legacy was bequeathed.

1. It is shown by the testimony on both sides, that, prior to May 1843, the Book of Dicipline (K) the Declaration and Testimony (I) and the Confession of Faith (H) were the standards of the associate church. The defendant insists, that the orator and his associates have refused sbmission to the decision of the synod in reference to the case of the Vermont presbytery and of Dr. Alexander Bullions,—that the decision of a church court must be submitted to right or wrong, that is, a decision of the synod, being the highest church court. The distinction between *personal* matters and matters of *faith,* made by Reed and Anderson in their depositions, is no where to be found, except in their depositions. The orator insists, that this principle, contended for by the defendant, is utterly at war with the first rudiments of presbyterianism, and with its whole system, that the fundamental rules of the associate church

make the *Bible* the great standard, both as to doctrine, discipline and church government, that the same rules give every member of the church the right to compare the decisions with the Bible, and to judge for themselves, whether the decisions are right, or wrong, and that, if deemed wrong, every one has the right to decline their binding authority and reject them. Declaration and Testimony (I) 126, § 5. Confession of Faith (H) 119, 120, 169, §§ 3, 4. Book of Discipline (K) 6.

This principle being established, we farther insist, that, if this court shall find, that the synod, in their proceedings against the presbytery of Vermont, or relative to Dr. Bullions, proceeded contrary to the laws and rules of the associate church, those proceedings should be held void. *Edwards* v. *Presbytery of Strathbogie.* We then farther insist, as a fundamental principle of presbyterianism and of the associate church, that, when the prevailing majority of the synod have departed from the standards of the church, and are guilty of a course of defections from its rules, the minority have the right to protest and secede, not from the *church*, but from that *prevailing majority*, that is, from the church judicatories. 1 Gib's Display of the Secession Testimony 37. Declaration & Test. (I.) 23–32, 108, 110. Wilson's Defence 135–137, 143–145, 155.

I propose first to consider two points, made by the defendant, before arriving at the main point, upon which he seems chiefly to rely.

I. That two others are trustees of the congregation, and that the legacy is in their hands, where the will places it. In answer to this, we say,—

1. The testimony tends to show them trustees of a *corporate society*, called the "Associate Society of Ryegate," a body different and wholly distinct from the "Associate Congregation of Ryegate."

2. This society has lost its organization, from the fact that its meetings have been illegally warned and its officers have never been qualified, according to the by-laws.

3. That, if its organization is not lost, the defendant is not a trustee, even of that society. 1, Because the meeting in 1841, at which he was elected, was not legally warned. 2, When met, the society was adjourned by the *legal voters*, but proceeded in the

Smith v. Nelson.

election of officers by votes of persons not members. *Wilcox* v. *Sherwin*, 1 D. Ch. 77. 1 Vt. 81. *Thomas* v. *Gibson*, 11 Vt. 607.

II. The defendant insists, that he has paid over the legacy and interest to his co-trustees, before the commencement of this suit. In answer to this we say,—

1. The evidence is against the fact.

2. This manœuvre was a piece of shuffling, performed just before the commencement of the suit, and cannot avail the defendant.

III. But the defendant claims, as his main ground of defence, that the presbytery of Vermont has been dissolved and that their ministers, of which our minister is one, are suspended, and all re-annexed to the presbytery of Cambridge, because they restored Dr. Bullions to the communion and fellowship of the church. The orator replies, that the doings of the synod, in these particulars, were arbitrary, and contrary to the word and spirit of the rules of the associate church, and unlawful, and should, therefore, by this court be deemed *void*.

I. The Synod has no power to *dissolve* a presbytery. The constitution and rules of the associate church no where confer such power. It is true, the synod has the power to erect new presbyteries; Book of Discipline 13; but it no more follows from this, that it may dissolve a presbytery and subject its members to another, than that Congress can dissolve the state of Vermont and re-annex it to New York, or New Hampshire. Again, the presbytery of Vermont was a *church court*, and, in receiving Dr. Bullions, performed a *judicial* act. The members of that court acted in their presbyterial character, and, if they misjudged, it was an error of *judgment* only, for which they cannot, as individuals be held amenable.

But should it be concluded, that the synod had such authority, then we say;

1. The presbytery was *libelled* and *condemned* without a hearing and without notice,—which is contrary to all law, civil and ecclesiastical. Pardovan 212. In 1839 the synod prejudged their case, without hearing and without citation. Upon the *relevancy* of this libel the presbytery were never heard,—to which, by law, they were entitled. Book of Discipline (K) 47. Pardovan 206, 207.

2. In 1839, after judgment had thus been passed by the synod,

they pretended to cite the presbytery to take a trial in 1840 ; but they were not legally cited ; the law of the associate church requires *three* citations, before proceeding *ex parte*. Book of Discipline 46. Pardovan 212, 213. The only citation issued was not with certification ; therefore the synod could not legally proceed to trial of the presbytery, unless it *appeared*.

3. The presbytery was not furnished with a list of witnesses,— which the law required; Book of Discipline 45, 46; Pardovan; nor with a copy of the charges.

4. The appointment of a *commission*, to dissolve the presbytery of Vermont and suspend its ministers, was illegal, and not warranted by the laws of the associate church. There is but one kind of commission known even to Pardovan, and that could not consist of less than twenty one members, a part of whom must be ruling elders; and it is a principle of the associate church, that no commission, or even committee, nor any church court, can be legal without ruling elders. Pardovan 46, § 8; 57, §§ 3, 4; 58, §§ 7, 8; 60, § 11.

5. This commission, even had the synod power to appoint one, could not legally *suspend ministers*. This power belongs exclusively to presbyteries. Pardovan 45, § 4; 53, § 1 *et seq*. Book of Discipline 11, 12.

6. The commission was also illegal, from the fact that one of the commissioners was one of the presbytery's *libellers* and *prosecutors*, and another had published slanders respecting it. The execution of the commission was unwarranted, because two, only, of the three, acted. Messrs. Pringle and Goodwillie have never been notified of any deposition, or dissolution of their pastoral relation.

II. The proceedings of the Cambridge presbytery, in relation to Dr. Bullions and those who favored him, *sanctioned and approved* by the synod, were of a still more extraordinary character, and totally at war with the principles and order of the associate church.

1. Dr. Bullions was illegally condemned, and the doings of the Cambridge presbytery and of the synod, in this matter, should be held, by this court, null and void. The members of that presbytery, who tried and condemned him, were not a *legal* court, for that purpose ; his *accusers* were his *judges ;* and those competent to try him were, by an unparalleled manœuvre, excluded from their seats. These proceedings were had at the *pro re nata* meeting of Novem-

67

ber, 1837. From the testimony it appears manifestly, that a majority of the members of the presbytery, competent to act, were in favor of restoring Dr. Bullions. Affinity is no ground for excluding members of church courts. Partiality is ground of exclusion; but this is a question always to be *tried*, but was not in this case. Again, the question of affinity and partiality is to be raised by the *accused*, and not by the court.

2. The proceedings of the presbytery of Cambridge were irregular and void, because Dr. Bullions *declined* their *authority*,—which, by the rules of the associate church, was a warrantable declination. Pardovan 230, 231, § 9.

Again, we insist, that the restoration of Dr. Bullions was no way counter to the rules and laws of the associate church.

1. The presbytery of Cambridge had sentenced Dr. Bullions to a *rebuke*. The presbytery of Vermont executed that sentence and restored him. This they were competent to do, even if he were under but the sentence of the lesser excommunication.

2. We insist, that, if Dr. Bullions (though illegally) was fully excommunicated, or if he were legally excommunicated, by the Cambridge presbytery, the Vermont presbytery had the right to take up his application, as that of any other person, who had never belonged to any church, and to receive him, if they adjudged him a proper person. The presbytery of Vermont received him, as one *fully* excommunicated, and the orator insists, that, from the proof, he was thus excommunicated, in their way. Book of Discipline 57, 58. The Book of Discipline has but *one* censure of excommunication, and but one form. The testimony shows, that Dr. Bullions was *twice* excommunicated.

Against these proceedings and others, of the presbytery of Cambridge and of the synod, those, to whom the orator and others adhere, protested, remonstrated and memorialized, until the synod treated their petitions with contempt. Therefore, after the example and upon the authority of the fathers of the secession, they found it their privilege, their duty and their right to *secede*, not from the *associate church*, but from the *prevailing party*. The defendant attempts to show, that the members of the synod, which met at Cambridge, were under censure. So were the Erskines, when they formed the *associate presbytery*. Gib's Display of the Secession Testimony.

But the orator insists, that the defendant has carved out a false issue, that the doctrine, which he attempts to establish, though it may, perhaps, consist, in a measure, with the church establishments of Great Britain and Scotland, yet can never be found suited to the meridian of this state. The testimony on both sides and the authorities referred to all prove, that church courts have nothing to do with property. Their jurisdiction is wholly confined to the spiritual concerns of the church and its members. Pardovan 65, § 25. *Baptist Church* v. *Witherell et al.*, 3 Paige 296. Confession of Faith (H) 166–170. We had supposed, that *here* we were beyond the reach of those laws, which direct and control men in matters of religious faith, in their mode of worship, their doctrine, discipline and church government. This principle, the orator insists, is the foundation of all religious establishments *in this country*, and that neither our courts nor legislatures have power to abridge it.

It is not necessary to inquire, by what rule the court would be governed, had the whole Associate Congregation of Ryegate became baptists, or episcopalians. Even in a case like that, it is difficult to see, how the Associate Synod of North America, or the presbytery of Cambridge, could take from them their property. But the present is a case, where a division has taken place in the same society. The court can have no doubt, from a view of the whole case, that the separation was a matter of conscience. We insist, that, before the separation, the legacy belonged to the members of the society, *males* and *females*. They did not hold it, however, in their *private* capacity, as tenants in common, but as a religious community, the proceeds to go to their minister forever. Now a division has taken place; and the dividing point is simply the *effect*, the *binding force* of the *decision* of a church court. Both sides claim to be presbyterians, both claim to be the associate church, both have their *sessions*, their *presbyteries* and synod, duly organized, and subordinate, one to the other.

If, then, it becomes necessary for the court to inquire, who is, and where is the Associate Congregation of Ryegate, contemplated by the will of the testator, we claim, where a *majority of its members are*, there is the Associate Congregation and to them the legacy should be decreed. If the whole congregation of Ryegate were with the orator, would the court say, that we could not take and

hold the legacy? If the ground assumed in the defence be well taken, then, in that event, the legacy must go to some other congregation, or revert to the heirs of the testator. This the defendant would not claim. If, then, the whole congregation, being with the orator, would be entitled to this legacy, a *majority* in number, being with him, will also be entitled to it. *Baptist Church* v. *Witherell et al.*, 3 Paige 296. But the defendant says, a majority of the *eldership* is with him ; but has the *eldership* any greater interest in the *property* than other *individuals ?* Their control extends only to the conscience.

Are the court prepared to adopt the doctrine of Lord Eldon, in *Attorney General* v. *Pearson*, 3 Mer. 264, and of Lord Lyndhurst, in *Attorney General* v. *Shore*, 7 Sim. 290, note, cited in 2 Story's Eq. 435-6, n., as the law of this country? In commenting on the former case Chancellor Walworth says, "I have always entertained serious doubts, whether any civil tribunal in this state could interfere, to prevent the *majority* of corporators, in a religious society, from introducing such changes in the *doctrines*, or *modes of worship*, in their churches, as they might deem expedient." Justice Story seems to doubt, whether the doctrine of these cases will ever be adopted in this country. 2 Story's Eq. 435, 436, n. It would seem, that the court here must adopt Lord Eldon's principle, or the principle that a *majority* of the society is to govern. While Lord Eldon administers the equity of the statute of 43 Eliz., this court will not feel at liberty to call in aid the principle he adopts, while administering the equity and spirit of the third article of our bill of rights, embodied in our constitution, and the 41st article of that Constitution. The government of the two countries is different, the laws are different, and in nothing do they more differ, than in regard to religious tenets and doctrines.

If the defendant's doctrine is correct, no religious society, though nineteen twentieths should conscientiously conclude, that they were wrong in any one point of doctrine, discipline, or church government, could correct that point, without doing it at the peril of forfeiting their property.

Again, in expounding a will and giving direction to a legacy, the *intent* of the testator is to be regarded. An expression of the giver's *gratitude*, in this case, for favors bestowed by the giver of all good,

Smith *v.* Nelson.

and the leaving of a *testimony* of the same, is one of the most prominent features of that intention. Can it be said, that, should this legacy be decreed to the orator, it will be any the less a testimony of the donor's gratitude? It would be far more reasonable to suppose, that his intentions would be best subserved by appropriating the legacy for the benefit of the very minister, whom he supported while in life.

*E. Farr* and *L. B. Peck* for defendant.

I. In every case of charity the court will give effect to the intent of the founder, whether the object be directed to religious purposes, or to purposes purely civil. When the intent is not apparent upon the face of the deed, or will, the intention becomes matter of evidence, and may be infered from the religious tenets of the grantor, from the conduct and acts of the parties, and from the nature and object of the transaction itself. *Attorney General* v. *Pearson,* 3 Mer. 353. *Attorney General* v. *Shore,* 7 Sim. 290, note. *McGeoch et al.* v. *Bullions et al., Cor.* WILLARD, Vice Chancellor, N. Y. *Gable* v. *Miller,* 10 Paige 640. *Attorney General* v. *Pearson,* 7 Sim. 290.

II. The object of the testator was, to give the fund to the Associate Congregation of Ryegate, in trust to pay the interest to the pastor, who adhered to the Associate Synod of North America. The organization and progress of the associate church in this country, the connection of the Associate Congregation of Ryegate and of the testator therewith, leave no room for doubt on this point. In 1754 the denomination of christians, known as the associate church of North America, now styled the Associate Synod of North America, were duly organized, as a church, in Pennsylvania, under the care and superintendence of the Associate Synod of Scotland. About the same time the churches in that state, adhering to the synod, were constituted a presbytery, which was denominated the associate presbytery of Pennsylvania, which was then subordinate to the synod of Scotland. About the year 1802 the congregations in New York, adhering and subordinate to this associate presbytery, were constituted a presbytery, styled the presbytery of Cambridge; to which the congregations in Ryegate and Barnet, in this State, were attached. In 1837 the two congregations in Vermont were erected

into a presbytery and denominated the presbytery of Vermont, by the Associate Synod of North America, the synod having assumed that name on the severance of all ties between this county and Great Britain by the war of the Revolution. This synod, since its organization, has been the supreme judicatory of the associate church, to which all the presbyteries and congregations of the church have been and are subordinate. Until the year 1840 the congregation in Ryegate and all its members adhered to the synod, and yielded obedience to its acts, as the supreme head of the church. In the year 1829, " the elders and other members of the Associate Congregation of Ryegate, in full communion, who have acceded to the Lord's cause, as professed and maintained by the associate presbytery of Cambridge, as subordinate to the Associate Synod of North America," called William Pringle to become their pastor. This call he accepted, and soon after, was ordained and installed, as the pastor of the congregation, by the Cambridge presbytery. One of his ordination vows was, to submit himself willingly and humbly to the admonition of his presbytery, as subordinate to the Associate Synod of North America. By the discipline of the associate church he was required to take, and did take, this vow. The *testator* was long a member of this congregation, adhering to the synod, and contributed yearly to the support of Mr. Pringle, as its pastor. When he made his will, the congregation of Mr. Pringle adhered to the synod, and matters so continued until after his decease. Under these circumstances there can be no doubt, that the intention of the intestator was, that the congregation should hold the fund, in trust, for the support of its pastor, so long as he adhered to the faith and doctrine of the associate church, and retained his connection with it.

III. The Vermont presbytery was dissolved, Mr. Pringle was deposed, and the congregations of Ryegate and Barnet were reannexed to the Cambridge presbytery, by decree of the synod, in the year 1840. This decree was made on due notice, and in due form. Mr. Goodwillie was present at the meeting of the synod in 1840, and was heard in defence of the presbytery. The want of legal notice was then raised by him, and the objection overruled, on the ground that due notice had been given. The members of the presbytery appeared before the synod's commission, in July, 1840,

and, refusing to yield obedience, the decree was executed by the commissioners. This, being done in presence of the presbytery, was sufficient notice of the decree.

IV. That the synod had authority to pass these decrees is satisfactorily proved. That it had power to dissolve the presbytery of Vermont cannot admit of a doubt. If this authority did not reside in that body, it existed no where. It is conceded, that it had power to erect the presbytery, and the same power would authorize them to dissolve it. If there is any doubt as to its authority to depose the ministers constituting the presbytery, there can be none as to the right of the Cambridge presbytery to do it. This authority was exercised by that presbytery in 1842, on due notice, which was communicated to the congregation.

V. The decrees of the synod and of the Cambridge presbytery were based upon satisfactory reasons. But whether so, or not, cannot alter their effect. These judicatories having jurisdiction of these matters, and having duly cited the parties in interest, their proceedings are conclusive, and this court cannot go behind those decrees. *Milligan* v. *Mitchill*, 3 Mylne & Craig. 853. *Dean* v. *Botton*, 7 Halst. 206, 220. *McGeoch* v. *Bullions, et al.*, above cited. 1 Phil. Ev. 340. HOSMER, Ch. J., in *Whitney* v. *Brooklyn*, 5 Conn. 405, 414. There can be no question, as to the propriety and correctness of this rule. Hence the question arises, whether Mr. Pringle and his adherents are members of the associate church, in good standing. How is this question to be decided, but by the decrees of the judicatories of that church, constituted for the purpose of settling all such questions? All analogies are in favor of the doctrine. The judgments of the ecclesiastical courts in England, in matters within their jurisdiction, are conclusive in Westminster Hall, when brought collaterally in question. The same rule obtains in this country, with regard to the decrees of all inferior jurisdictions, while acting within the scope of their authority. *Davy* v. *Haddon*, 3 Doug. 310. *Moses* v. *Macferlan*, 2 Burr. 1005. *Rex* v. *Grundon et al.*, 1 Cowp. 315.

VI. Any irregularity, or want of form, in the proceedings of the synod, or presbytery, cannot avoid the effect of their decrees. Nothing short of the omission of notice to the party, or the want of jurisdiction, will avoid their judgments. Upon this point it is objected ;—

Smith *v.* Nelson.

1. That the commission of three, sent by the synod *to Barnet,* in July, 1840, who professed to suspend Mr. Pringle, did not all act. It is true, that one of them, being sick, was not in the meeting at the time judgment was pronounced; but the majority were present, and the other was consulted.

2. That, if the synod had authority to decide the case, they had no authority to appoint a commission, as·in this case. It is a sufficient answer to this, that such commissions have been common and usual, and ever sanctioned in the history of the church. They are *not a separate court,* but appointed as agents of a court; and the uniform practice of the synod to appoint them, acquiesced in by the church, is equivalent to an express authority, and *pre-supposes it.* The duties devolved upon the commission were merely ministerial, and not judicial.

3. That the commission contained no ruling elders. To this we answer, that the practice, which authorizes commissions, does not authorize, or, at least, does not *require,* ruling elders to be members; they have not been so, in the practice of the associate church, or of any church, in those special commissions, appointed to terminate particular business.

4. That the presbytery of Vermont were not *regularly* cited before the synod, at its session in 1840, when their case was tried. To this we say, that the question of notice, and what is sufficient, is somewhat in the discretion of the court; and if the court, on a hearing upon the question of notice, decide it sufficient, it will be presumed to have been proved, although the evidence may be lost. In this case the question of notice was raised in .the synod in 1840, the clerk stated what he had done, Mr. Goodwillie was present and heard the proof, no one questioned it, and the synod decided, that the presbytery had been regularly notified. Surely this is conclusive.

5. That the synod decided the relevancy of the charge against the Vermont presbytery at its first presentation in 1839, before the presbytery was cited, and this was prejudging the case. The facts are, that the synod, while in session in 1839, was, as a court, informed of the conduct of the Vermont presbytery, by a charge being laid against them; if the charge were frivolous, and constituted no offence, even *if true,* they would not issue a citation and put the

party to the expense of a trial; but if it were of a serious nature, such as required censure, if true, they were bound to notice it; they must, then, decide, whether it was of a character deserving notice, if true, that is, its *general* relevancy, before the party could be cited and required to go to trial; this they did, and no more.

6. But it is said, that the presbytery of Vermont did nothing worthy of censure, in admitting and pretending to restore Dr. Bullions. Having shown, that the presbytery was cited to answer to the charge and was properly tried and found guilty, we should not be required to meet this objection. But the defendant wishes to remove every ground of prejudice. We say, therefore, that it was disorderly;—

1. Because presbyteries, like synods, are defined by territorial limits. Dr. Bullions lived within the limits of the Cambridge presbytery; and no one, living within the bounds of one presbytery, can become a member of another.

2. Because, although deposed, he was in the care of the presbytery of Cambridge for farther dealing, specially remitted to them, for that purpose, by deed of the synod.

3. It was assuming the powers of a co-ordinate court, which no court has a right to do; for no one, under censure, can be restored by another co-ordinate court, without the consent of the first, accompanied by the evidence relating to the case.

4. Because all the ministerial members of the presbytery of Vermont had been legally excluded from sitting in Dr. Bullions' case.

5. It is pretended, that Dr. Bullions was, at the time, fully excommunicated, and so free. This, if so, would not do away the first, third and fourth objections, above stated. But it was not so; the form, that was used in the last sentence upon Dr. Bullions, is not the greater excommunication, of which the form is given in the Book of Discipline (K) 66, but is expressed, in its own terms, as the lesser sentence of excommunication, accompanied by deposition; the principal sentence, then, was *deposition;* after this the presbytery commenced proceedings with Dr. Bullions, with a view to the greater sentence of excommunication,—which was never passed.

Whether any previous dealings with Dr. Bullions in the Cambridge presbytery were just, or unjust, can make no difference with the

68

Smith *v.* Nelson.

Vermont presbytery; yet we will examine them. In a meeting of the Cambridge presbytery, Oct. 5, 1837, on trial of a case, Dr. Bullions said "there were four members present, not fit to sit in any court," and, when required, according to rule, to give the names and specify the charges, he refused to do so, and, for reason, *denied the words.* For this he was *rebuked;* he refused to submit and persisted in his course; afterwards, the same day, he was suspended, (which is the lesser excommunication,) by vote of six to two,—the moderator not voting ever, except to give the casting vote. Afterwards, at the *pro re nata* meeting, Nov. 14, Messrs. Pringle and Goodwillie were, by vote, excluded from seats in this case for *affinity* and *partiality,*—one being the brother in law and the other the son in law of Dr. Bullions. The orator claims, that this was wrong, and that it turned the case against Dr. Bullions. It is no where denied, in the orator's testimony, that partiality is just cause for exclusion; it is only denied, that affinity is just cause; but this would not affect the case, for partiality was alleged, and was sufficient. But either cause was good. Pardovan 745. This question was tried; evidence was heard, and all the time and all the hearing was allowed to Messrs. Goodwillie and Pringle, that was desired. The vote of suspension was passed previous to their exclusion; the parties then stood six to two,—without the moderator; after their exclusion, the presbytery voted certain requisitions upon Dr. Bullions, *unanimously,*—for not complying with which he was finally deposed on the eleventh of April, 1838. The number of members present in the presbytery, that voted on these requisitions, was sixteen, on some of the votes; on the question whether Dr. Bullions had complied with the separate requisitions the votes were *unanimous* against him; and on none were there more than two in his favor; there were but three members of the presbytery excluded from their seats; and on no vote, on any of the main questions, would those three votes, if thrown for Dr. Bullions, have turned the vote in his favor. Afterwards, in open presbytery, Dr. Bullions said, that his statement, as to four members, was unfounded and slanderous, even on supposition that the reports, to which he referred, were true,—thus convicting himself of wilfully slandering members of the presbytery. But this retraction was not given, until after the censure, for not giving the names, was voted. Mr. Gordon, however, accused Dr. Bullions

with being the author of the same reports, to which he had alluded, and that they were slanderous. For this Mr. Gordon was put on trial in the presbytery, and his brother was excluded from voting. On this trial it was proved, and voted *unanimously*, that Mr. Gordon's statements were true,—thus again convicing Dr. Bullions of duplicity and falsehood. For all these things, having given no satisfaction, Dr. Bullions was deposed by a unanimous vote of the presbytery; and this vote, on appeal, was affirmed by the synod, and Dr. Bullions specially remitted to the Cambridge presbytery for farther dealing. In this state of the case the presbytery of Vermont took up Dr. Bullions and pretended to restore him.

VII. The effect of the decrees of the synod was, to dissolve the presbytery of Vermont and the pastoral relations existing between the deposed ministers and their congregations. This is placed beyond all question by the proofs in the case and the standard writers of the church.

VIII. The orator proceeds upon the ground, that he represents the true Associate Congregation of Ryegate, that the congregation have a pastor, regularly officiating, and for whose benefit he has the right to claim the funds. It is apparent, that the bill is brought for the benefit of Mr. Pringle and his adherents. This right they have lost, by the acts of the synod and the presbytery of Cambridge. The adherents of the deposed minister, those who place at defiance the government of the church and the orders and decrees of its highest judicatories, cannot claim the fund. In the case of *Mc-Geoch et al.* v. *Bullions et al.* the Vice-Chancellor lays down the rule, that, in the settlement of a pastor, there are implied, as well as express, stipulations, the breach of which, on his part, would render his continuance as pastor, by the trustees, an abuse of their trust. Should a pastor, without the unanimous consent of the congregation, introduce and preach a new doctrine, contrary to the faith and practice and the received standards of the church at the time of his ordination, it would be a breach of the implied, if not express, contract, which he entered into at his ordination. Those who dissented from his views and adhered to the original doctrine of the church would be entitled to the aid of a court of chancery, to restrain the trustees from permitting such perversion of their funds. This doctrine is not new, but has been long recognized and acted upon, both

Smith *v.* Nelson.

in this country and Great Britain. *Att'y General* v. *Pearson,* 7 Sim. 220. *Milligan* v. *Mitchill,* 3 Mylne & Craig 72. *Att'y General* v. *Pearson,* 3 Mer. 353. *Field* v. *Field,* 9 Wend. 401. *Gable* v. *Miller,* 10 Paige 640. *Hendrickson* v. *Decon,* 1 Saxton's N. J. Rep. 577.

We insist, that there is an *implied* contract, between the pastor and his congregation, that he shall continue in the same ecclesiastical connection, in good standing, during his ministry. The evidence in the case shows, that, since the difficulty arose with Dr. Bullions, some few ministers, who formerly belonged to the associate church, but who have been excommunicated, have united with Dr. Bullions and formed a new synod, which they claim to be the true synod of North America. To this synod the orator and Mr. Pringle and their supporters adhere. Can it be seriously insisted, that, under such circumstances, these persons have any claim upon the fund, or that it was created to aid them in the furtherance of their views? As well might they have claimed it, if they had become mahommedans, or jews.

IX. This bill cannot be sustained in the name of the orator. He claims the money on the ground that he is treasurer, and he must recover in that right, if at all. By the provisions of the will the fund was to be paid to the trustees of the congregation. The trustees of the associate society are in fact the trustees of the congregation. The fund, then, is in the hands of those, who have the right to hold it, by the express terms of the will. If the orator has any right to interfere with it, he should have proceeded against the trustees.

X. The bill cannot be sustained against the defendant, as administrator. Before the commencement of the suit he paid over the fund to the trustees of the associate society, who now hold it, in trust, for the benefit of the associate congregation. By this payment he is discharged as administrator.

The opinion of the court was delivered by

WILLIAMS, Ch. J. This is an appeal from the decision of the chancellor in the fourth judicial circuit. The facts, so far as is necessary to show the grounds of our decision, are as follows :

William Nelson, late of Ryegate, made his last will and testament

on the thirtieth day of September, 1830, and, among other bequests therein, was the following :—"As a testimony of my gratitude to the giver of every good and perfect gift, I farther will and devise the sum of one hundred and fifty.dollars, as a donation to ' The Asso- ciate Congregation of Ryegate,' to be placed under the direction of the trustees of said society, and the interest thereof to be annually paid to their minister forever." The testator died the twenty fourth of January, 1831, and the will was duly proved by the executors. In March, 1841, the defendant, John Nelson, was appointed adminis- trator *de bonis non,* with the will annexed, the legacy before men- tioned not having been paid, and, on a settlement of his administra- tion account in May, 1842, the legacy, together with about seventy two dollars interest thereon, was found in his hands, and he was held chargeable therewith.

It appears farther, that there has been a society in Ryegate for a period of more than fifty years, of persons of the presbyterian denom- .ination of- christians, ascociated for the purpose of promoting the preaching the gospel, procuring preaching, &c., called the *Associate Congregation of Ryegate,* who have elected officers of the society, to wit, a moderator, clerk, treasurer and collector, or collectors, an- nually, and in March, 1843, in addition to these other officers, they elected three trustees. The Rev. Mr. Pringle was regularly settled and ordained, as minister of this congregation, as early as the year 1830, has officiated as such to this time, and still continues to be so, unless from the farther facts, which are in evidence, he was sus- pended, or ceased to be their minister, in July, 1840.

Previous to the year 1838 the ministers and officers of the con- gregations in Ryegate and Barnet belonged to and formed part of the associate presbytery of Cambridge, in the state of New York ; but in that year they were constituted by the Associate Synod of North America into a separate presbytery, called the associate pres- bytery of Vermont, and duly organized as such.

A difficulty arose in the presbytery of Cambridge in relation to Dr. Alexander Bullions, in consequence of his reflecting upon four members of the presbytery, to wit, Messrs. A. Gordon, David Gor- don, James Miller, and Abraham Anderson, the result of which was, that he was, on the seventh of October, 1837, censured by the presbytery .and suspended from the ministry, and, by a vote on the

twelfth of April, 1838, deposed from the ministry. Between the times when he was first suspended and eventually deposed, to wit, on the twelfth day of November, 1837, there was a full meeting of the presbytery, on the petition of Dr. Bullions' congregation in Cambridge, to take into consideration his case. All the members of the presbytery were present at this meeting, and a majority of two were in favor of restoring Dr. Bullions to the communion of the church and the full exercise of the ministry. But, before any vote was taken, a resolution was passed to exclude the Rev. Mr. Goodwillie and Mr. Pringle from their seats in the presbytery, in the case of Dr. Bullions, the two being embraced in the same resolution and vote; and this was carried by the casting vote of the moderator, Mr. James P. Miller; and, after these two were excluded, Rev. Mr. Whyte was also excluded; the two first on the ground of affinity and partiality, and the latter on the ground of partiality; by connecting the two, Messrs. Goodwillie and Pringle, in one resolution and vote, they were both prevented from voting in the case of each other, and thereby a majority remained unfavorable to Dr. Bullions. The persons, who procured the ejection of these members of the presbytery, were Messrs. Anderson, Miller and Gordon, who, it appears, were the accusers of Dr. Bullions and the persons, aggrieved by his conduct. They voted to exclude Messrs. Goodwillie and Pringle, above named; and, in all the subsequent procedings against Dr. Bullions, they were not excluded from, and did not decline, voting.

At this meeting in November, after the gentlemen above named were excluded from sitting, Dr. Bullions was heard in explanation; but his explanation was not deemed satisfactory. Commissioners, who attended in behalf of his congregation in Cambridge, wished to know what would be satisfactory. The presbytery thereupon proposed seven requisitions, to which Dr. Bullions was to give his answer at an adjourned meeting, to be holden in December; but to one of these they required an immediate answer. Of the nine ministers who were present at this time, the case of Dr. Bullions being on trial, Messrs. Goodwillie, Pringle and Whyte being excluded, only five ministers were left to act, viz. Mr. Anderson, Mr. A. Gordon, Mr. D. Gordon, Mr. Miller and Mr. Stalker, the first four being the persons whom it was alleged Dr. Bullions had slandered, by his decla-

ration, at a previous trial of Mr. Stalker, that they were unfit to sit in any court. That the requisitions would not be very likely to be either acceptable, or conciliatory, proceeding from the men with whom it is evident Dr. Bullions had the difficulty, is to be inferred from the slightest acquaintance with human nature, and the operation of the feelings, passions and prejudices, to which all men are subject. Accordingly we find, that, at the meeting in December, the answers, or explanations, of Dr. Bullions were not deemed satisfactory, and a vote was taken to that effect. At this meeting the only ministers present were Mr. Stalker, Dr. Bullions, and Messrs. Anderson, Miller and D. Gordon. Their first vote was, on motion of Rev. David Gordon, to exclude Mr. Stalker from sitting in that case; thus leaving Messrs. Anderson, Miller and Gordon, the only remaining ministers, together with the elders, to decide and judge in the premises. This vote was subsequently reconsidered. At the meeting holden on the tenth, eleventh and twelfth of April, 1838, the same members were present, except Mr. Anderson, who was absent with leave, and Mr. Stalker, also absent, who had been excluded from sitting, as before mentioned. The presbytery, thus constituted, unanimously deposed Dr. Bullions from the ministry, and prohibited him from exercising any part of the office of a minister. This decision was affirmed by a majority of the synod, at their meeting held in Philadelphia, in May and June, 1838. In the votes taken on this subject in the synod, Rev. David Goodwillie, who stood in the same relation to Dr. Bullions as Rev. Thomas Goodwillie, was permitted to sit and vote, without any objection from any quarter.

At the same meeting of the synod, on application of the presbytery of Cambridge, the presbytery of Vermont was erected and constituted by vote of the synod, and the ministers and elders within the bounds of the State of Vermont were required to meet at Barnet, to organize the presbytery. The presbytery of Vermont accordingly held a meeting at Barnet in July, 1838, and was duly organized, according to the forms of the church, at which time Dr. Bullions applied to them to be restored to his former standing in the church, and, on submitting to a censure, it was voted, that he be restored to the communion of the church and the exercise of his ministry,—the presbytery considering him at that time as fully excommunicated. For this act of the presbytery of Vermont the

presbytery of Cambridge complained to the synod; and the synod, at their session in May, 1839, resolved, that the act of the presbytery of Vermont, in the restoration of Dr. Bullions, was a contempt of the authority of the synod; second, that it presented an instance of solemn mockery and perversion of the divine institution of church government; third, that the conduct of the Vermont presbytery was not only illegal and unconstitutional, but disreputable to the ministerial and christian character of the bretheren themselves of that presbytery, and consequently calculated directly to injure religion; fourth, that it was a most disorderly and irregular attempt to usurp the prerogatives of a co-ordinate presbytery, and to destroy all order and government in the church; fifth, that it was trifling with and in direct violation of their ordination vows; sixth, that it was unbrotherly towards the presbytery of Cambridge, and directly calculated to disrupt all fraternal feelings : they therefore resolved, " that the conduct of the presbytery of Vermont rendered it evident to the synod, that it was unsafe to commit to them the presbyterial oversight of that portion of the church, by the synod committed to their care; that the presbytery be suspended from the exercise of presbyterial authority until the next meeting of the synod, and that the brethren and all the congregations under their oversight be committed to the care of the presbytery of Cambridge until the next meeting of the synod," and " that the members of the presbytery be cited to appear at the *Bar of the Synod*, at its next meeting, to answer for their conduct." This was adopted by a vote of sixty one to thirty six, to which there were several protests. It was then voted by the synod, " that the deeds of the associate presbytery of Vermont, in restoring Dr. A. Bullions to the office of the ministry and the communion of the church, and admitting him as a member of that presbytery, are null and void from the beginning."

At the time these resolutions were passed, no members of the presbytery of Vermont were present, nor had they been cited to appear, or had any previous notice, that such proceedings were to be had. A citation then issued to the presbytery of Vermont, whether regular or not is not important, and, at the synod in 1840, they did not appear, and it was voted they should be rebuked, should submit to the decision declaring their deed in restoring Dr. Bullions null and void, and, upon their compliance with these decisions, they be restored.

A commission, consisting of Messrs. Abraham Anderson, James Martin and Joseph T. Cooper, was then appointed to meet in Barnet, call the presbytery before them, and execute the decision of the synod, and with farther instructions, in case of non-submission, to dissolve that presbytery, to suspend the members of it from the exercise of the ministry and communion of the church, until they acknowledge their sin and return to their duty ; to refer them to the presbytery of Cambridge for farther dealing, and to place their congregations under the care of the latter presbytery.   This commission accordingly, in July, 1840, proceeded to Barnet ; and one of them, Mr. Martin, being sick, the other two executed the commission, dissolved the presbytery of Vermont, suspended the ministerial members from their office, referred them to the presbytery of Cambridge for farther dealing, and their congregations to the care of the same presbytery.   The congregation of Ryegate, however, June 30, 1840, voted, *nem. con.*, to join in a protest against the decision of the synod, and to stand by their minister.

The presbytery of Cambridge afterwards, in January, 1842, proceeded to depose Mr. Pringle and Mr. Goodwillie from the office of the ministry, and from exercising the same, and declared their congregations vacant.

It appears farther, in the examination of the testimony, that, as early as 1823, an association was formed, called the *Associate Society of Ryegate*, for the purpose of holding lands, or other property, whereon to build a meeting-house, or house for the minister, or for the benefit of the society; that this society was re-organized from time to time, and, among the officers provided for in their by-laws, was a trustee, or trustees.   In 1841, after the divisions had arisen in this society, a spirited contest was had for the election of trustees, which ended in their declaring John Nelson, the defendant, John Gibson and Alexander Gibson trustees of the society.   There was evidently, however, an irregularity in that election, in permitting persons to vote who were not legal voters.

The defendant, however, as administrator of William Nelson, paid over this legacy to these trustees, the principal in May, and the interest in November, 1842.   The legacy, or the interest, was demanded of the defendant, as administrator, by the attorney for the orator and Associate Congregation, and was refused, unless on his

69

Smith *v.* Nelson.

signing a receipt to the before named persons, as trustees. This was declined on the part of the orator, though he offered to exe-cute a receipt to them for the money, but not acknowledging their character as trustees. There are also some objections to the organ-ization of the latter society, to which it is not material to advert, as they have no effect on the decision.

It farther appears, that the presbytery of Vermont, several other members of the congregations of Vermont, Mr. Whyte and others from the presbyteries of Cambridge and Albany sent memorials to the synod, which met at Washington, Penn., in 1841, praying them to review their case and to reverse the decision; but this was utterly refused, was considered as a repetition of their contumacy, the me-morial of the presbytery was returned to the person presenting it, and, to the memorial of the Rev. Mr. Whyte, a committe, consisting of Messrs. Anderson, Miller and Martin, were appointed to report an answer. After this, in the same year, on the fifteenth of June, 1841, the exscinded brethren in Vermont and of the Cambridge and Albany presbyteries assembled at Cambridge, formed a new organization, and claimed to be the true Associate Synod of North America.

A minority of the members of the church and congregation in Ryegate, who still adhere to the synod, joined by some members of the church in Barnet, who are in the same situation, have since given a call to the Rev. Isaac Law.

In the consideration of this question my mind is not embarrassed by the considerations, which have been presented, arising from the organization, or constitution, of the associate church, or from the consideration of the proceedings, or sentences, of any ecclesiastical tribunal whatever. ( The bequest, or the trust declared by the will, does not appear to me to be equivocal in the least; It is a legacy to the society called *The Associate Congregation of Ryegate.* This society, under our constitution and laws, is capable of receiving and holding a legacy. By the constitution of this State, all religious societies, or bodies of men, " united or incorporated," are to be pro-tected in the enjoyment of their estates, &c. The object of the legacy is sufficiently explicit, as a donation to the society, "the interest thereof to be annually paid to their minister forever." I should consider this, and all similar donations, as a gift or grant to

Smith v. Nelson.

the society; and the only inquiry, to be made in relation to it, would be, whether the society still existed, and whether they have a minister, chosen and appointed by the majority and regularly ordained over them, agreeably to the usage of the society, or church, to which they profess to belong; and in this view I should clearly recognize the right of such society to elect such minister, as they thought proper.

Not having any religious establishment in this country, and our population continually varying and shifting, one denomination of christians being at one time the most numerous, and in the course of a few years another, unless this right of the majority is recognized, and a gift, or donation, is to be construed as having reference to this state of our society, and as being intended, by the donor, to be controlled by a majority, property given, devised, or bequeathed, to a religious society, and for a religious purpose, might, in the course of a very few years, be wholly locked up and secluded from any useful or beneficial purposes; and we never ought to give such a construction to a legacy, or gift, unless imperatively called on so to do by its explicit terms. However *strange* it may sound to the ears of an Englishmen, as was observed by the Lord Chancellor, in the case of *Leslie* v. *Birnie*, 2 Russ. 114, that a minister is to be elected by "the elders, members and seat holders," yet I apprehend that the very spirit of our institutions does explicitly recognize this right of electing or employing a minister, as vested in the corporate body, or the majority of the individual members. In conformity with this principle have been our decisions in relation to meeting-houses, or churches, erected for public worship. The society may repair, take down and rebuild its meeting-house, with or without compensation to the pew-holders, as the case may be, and erect another, without any particular regard to the way, or manner, in which it was first built, or the religious tenets of those who first erected it, or made donation therefor. *Kellogg* v. *Dickinson*, ante p. 266, and cases there referred to. *Baker* v. *Fales*, 16 Mass. 488. *Baptist Church* v. *Witherell*, 3 Paige 296. In this latter case the learned chancellor very ably and fully expresses my views of the nature of a grant to a religious society, the jurisdiction of a court of equity, the effect of a sentence of a church judicatory, and the rights of a majority of the members of a religious society. The terms of a

deed of trust, or of a legacy, however, may be so explicit as to control this right of a majority, or compel a court to declare a trust ineffectual.

In the case of *Milligan* v. *Mitchill*, 1 Mylne & Craig 433, Mylne & Keen 446, the chancellor found, upon the evidence, a trust and a breach of trust, and upon that decreed the relief prayed for ; and, inasmuch as the by-laws of a society may constitute and become a part of the donation and of the trust, the inquiry may be had, as it was in that case, whether their by-laws may be altered, without forfeiting the gift. It is to be observed, however, in that case, that the religious sentiments of Mrs. Drake, who made a will in 1730, did not enter into the consideration of the decision, nor was the right of a majority to repeal any of the by-laws, when it did not affect any right of property, questioned. There is nothing in the legacy of Mr. Nelson, which brings the case within the principles decided in that case, or which requires us to examine, how far that decision is compatible with " the local situation and circumstances " of this State, or " with the laws and constitution of the same."

These views, already expressed, would be sufficient in my mind to warrant a decision, that the orator is entitled to this legacy for the benefit of the Associate Congregation of Ryegate, and that they may appropriate it for the payment of the salary of Mr. Pringle, as their minister, who was duly constituted such in the life time of the testator, was such, when he made the will, and who continues to be such, if the wishes and votes of a majority of the society are to be regarded. And this relation, I apprehend, is not to be dissolved against the will of Mr. Pringle and of a majority of the congregation, by the proceedings of any ecclesiastical tribunal. The court, however, are not disposed to rest their decision on this ground, but have examined the positions which have been taken and urged in the argument, and the result has been the same, in whatever attitude the case is presented.

In recurring to the proceedings of the congregation, different presbyteries, and synod, which have been brought to our notice, as well as the effect they are to have on the subject in controversy, and the authorities which have been read, it becomes necessary to examine the foundation of ecclesiastical law, the powers of their judicatories, the effect of their sentences in this country, as com-

pared with the same in Great Britain, and also the striking differ-
ence, which exists between them in that country and this, which
will necessarily require different determinations on subjects appa-
rently similar, when brought before the courts in Great Britain, or
in this State.

In England the ecclesiastical law and the ecclesiastical courts are
established by legitimate authority and become a part of the law of
the land.   By the common law, the King is the head of the church ;
which means, that all ecclesiastical power and authority is estab-
lished by him, and by and under law.   No canons can be made,
except by his consent.   Ecclesiastical courts and ecclesiastical law
are adopted, as part of the common law.   Their proceedings are
according to the forms of the civil law, and the King may pardon
all offences, within the jurisdiction of the spiritual courts.   The
courts of common law have and exercise a superintendence over
their proceedings, and may keep them within their jurisdiction, and
control them by writ of mandamus, prohibition, &c.   The authori-
ties for this may be found in *Caudrey's Case*, 5 Co. 1 ;  3 Com., Tit.
Ecclesiastical persons ;  7 Com., Tit. Prerogatives, D. 8–10, 17 ;
*Bishop of St. Davids* v. *Lucy*, 1 Ld. Raym. 447, 539.   The sen-
tences of these courts are there entitled to the same consideration,
as the sentences of any other inferior tribunal.   Their decisions are
final and conclusive on all subjects within their jurisdiction ;  but,
as I have said, they may be controlled and examined into by the
courts of law.   Thus a prohibition will issue, when they take cog-
nizance of matters clearly within the jurisdiction of the temporal
courts, and also when they proceed on matters not sufficient to jus-
tify proceedings, either in a temporal or spiritual court.   39 E. C.
L. 548.   The government and jurisdiction of the church in Scotland
are also established by authority of parliament.   Abridgment of
Acts of Parliament, Pardovan 225.

In this State the case is wholly different.   We have no religious
establishment, no ecclesiastical law, or courts, established by any
authority.   All their laws are wanting in this essential requisite, to
give them any authority, that they are not "*prescribed by the su-
preme power in a State.*"   And though they may form constitutions,
enact canons, laws, or ordinances, establish courts, or make any
decisions, decrees or judgments, yet they can have only a voluntary

obedience, cannot affect any civil rights, immunities, or contracts, or alter or dissolve any relations, or obligations, arising from contracts. When their proceedings are to be examined by ordinary tribunals of justice, their *power* is a phantom, and they can receive no other consideration, than the *regulations of any other voluntary associations*, formed for trifling, or grave and important, *purposes.* Obedience to the requisitions of any ecclesiastical societies may be required, under the penalty of spiritual censures ; but this is the only penalty incurred by disobedience; and whether one submits to, or defies, the proceedings of any ecclesiastical court, or any censures passed by them, depends on his conviction of the regularity, or irregularity, of their proceedings. In short, they can only affect the conscience of the individual ; how far they affect this, he must be the judge.

It is not to be inferred by this, that I am indifferent to the subject of ecclesiastical organization, government, or discipline. As an individual I should be disposed to submit to all regulations, not inconsistent with my duty to a higher power, and should examine their proceedings with great consideration and care, before I should venture to question their propriety. But in a court of justice, sworn to administer justice according to *law*, I cannot recognize any constitution, laws, ordinances, or sentences of any ecclesiastical tribunal, or of any voluntary society, as having any efficacy or power over the civil rights, immunities, or contracts of individuals. In *Cullen* v. *Duke of Queensbury*, Lord Thurlow said, of a voluntary society, that he would convince the parties, they had no laws and constitutions. And Lord Eldon spoke with contempt and alarm of a lodge of freemasons, who affected a corporate character, and exhibited their laws, forms and constitutions upon record. And of these voluntary associations, though they frequently make constitutions and pass by-laws, which they declare are not to be altered, except in a certain way, or manner, as by the concurrence of two thirds, or at two different meetings, &c., yet their constitution and laws may at any time be altered, or abrogated, by the same power which created them, and the vote of any subsequent meeting, abrogating, or altering, such constitution, though passed only by a majority, has as much efficacy, as a previous vote establishing them. A constitution for a voluntary society may be proper, as an organization, but it has none

of the powers or requisites of a constitution in political bodies, which emanates from a higher power than the legislature, and always is supposed to be enacted by a power superior to the legislature, and hence is unchangeable, except by the body which established it; but that body can change it at pleasure. It is idle, however, for such societies to talk of constitutional restrictions, or absolute or unlimited power, either in conventions, associations, presbyteries, or synods.

There cannot, in this country, be attributed to the decisions of a synod, or the decisions of any ecclesiastical judicatory, either infallibility, or freedom from error, nor can they claim rightfully unlimited obedience; and when it is attempted to give to their adjudications the same effect, as is given to the sentence of ecclesiastical courts in England, or the superior courts of common law, the attempt must be unavailing; even the limits of the obedience which is due to the church courts of the associate church, to which all these parties belong, from the members of the denomination, and for a disobedience to which the party may be subject to church censures, is by no means accurately defined. Mr. Goodwillie, in his testimony, says, the church courts have not sovereign, arbitrary and absolute power; that if their decisions are not agreeable to the word of God, they are not to be received; and that every man has a right to judge for himself concerning their determinations. Mr. Reid considers the decisions of church courts as binding, *provided such decisions are not contrary to the word of God.* He makes a distinction between such as affect personal cases, and such as affect doctrines and matters of faith. Mr. Anderson considers them as absolutely binding, and rejects the distinction between decisions on matters of faith and doctrine, and decisions in personal or public matters. In the declaration and testimony of the Associate Presbytery, adopted in 1784 and revised in 1813, Art. 10, sec. 5. par. 3, it is expressly declared, that their decisions, if not agreeable to the word of God, are not to be received; and the right of every man to judge for himself, concerning the determinations of church judicatories, is expressly recognized. In the proceedings before the Vice-Chancellor of the State of New-York, between Stevenson and Dr. Bullions, I find Mr. Anderson claimed, that, if Dr. Bullions had a seat in the presbytery in a trial then pending, he should claim, in the event of

the decision being against him, that the *proceeding was vitiated* by Dr. Bullions' having a seat ; and at the time of the secession of the Associate Church from the General Assembly in Scotland, in 1733, by Erskine and others, in their review of the proceedings of the judicatories against them, they say, " We are indeed bound at our ordination to subject ourselves unto the judicatories of the church ; but it is not an absolute subjection that we engage unto," not a " blind and implicit obedience; " and they proceed to declare, that the same vows, which bound them formerly to communion, equally bound them to secede. *Non nobis tantas componere lites.* We can only observe, that the doctrine of passive obedience and non-resistance, which was exploded in the last century, cannot find favor, at this day, in a court of justice. These different and discordant views of the duty of submission, and indeed the whole controversy in this case, show how impossible it is for a court of law to endeavor to fix any standard, by which to determine and regulate the duty of obedience to the proceedings of any voluntary associations, whether for civil or ecclesiastical purposes, and how unsafe and improper it would be, to consider any church as vacant, and the relation of minister and church, or congregation, dissolved, against the consent of both, by the sentence, or decree, of an ecclesiastical court, to which, at the most, only a voluntary obedience can be required.

It is, however, claimed, in this case, that there is an implied contract between a minister and his people, that he should continue in the same ecclesiastical connection; and that, Mr. Pringle having been suspended from the exercise of his ministry, the contract between him and his people is dissolved, and the congregation cannot be entitled to any funds, given or appropriated for the support of a minister.; that the intent of the testator was to give this legacy to the congregation at Ryegate, as a part, or branch, of the associate church of the United States ; and that, as the associate church have, according to the rules of discipline, deprived Mr. Pringle of the character of minister, no benefit can be had from this legacy for his support. This involves the consideration of the subject of such implied contract, the intent of the testator, and the proceedings of the different presbyteries and of the synod, according to their rules of discipline and church government, and, as a branch of the first inquiry, the right of secession.

With respect to any implied contract between a minister and his people, it may be remarked of this, as well as of any other contract, that we cannot add any thing by implication to the express terms of the contract itself. The parties may make conditions and qualifications, as they deem necessary. It may be true of this, as of all other agreements for future services, that there must continue and remain an ability to perform, or the party failing may be subject to the consequences attached to a breach of an obligation. When a minister ceases to be able to perform his ministerial duties, in consequence of any immorality, or a church censure for such immorality, it may afford a sufficient reason for the parties mutually to dissolve the relation, or for one of them to treat the contract as forfeited and rescinded by the other. But when both parties to the contract are satisfied, and *neither* desires the relation to be dissolved, it is not for this court, at the instance of others, not parties to the contract, to seek for understandings and implications, by which to avoid it, or to inquire, whether it would conduce to the satisfaction of others, to have a more acceptable minister, or one more closely connected with the denomination to which he belongs.

The church and congregation in Ryegate, before the settlement of Mr. Pringle, and indeed the associate church itself, was founded on the principle, that it is both the right and duty to secede, as was done by Erskine and others in 1733, from the prevailing party, who may obtain a majority in the judicatories, synods and assemblies, when, in the opinion of the seceders, such majorities have departed from the word of God, and the received and approved standards of doctrine, worship, government and discipline. Gib's display, sec. 7, p. 36. The congregation in Ryegate and Mr. Pringle still profess to be presbyterians, and to adhere to the doctrines, government and discipline of that denomination. We can, therefore, discover, in this case, no implied contract violated, which should have the effect to dissolve the contract between him and the congregation of Ryegate,—more especially, as that congregation do not complain of any such violation.

2. In relation to the intent of the testator, that the legacy should be given to the congregation of Ryegate, as a part, or branch, of, and connected with, that part of the presbyterian denomination of churches called the associate church. It has already been remarked,

70

there is nothing ambiguous in the terms of the legacy; nor do we perceive any thing in any rule of law, which requires us to consider the testator, in this bequest, as having any regard to the connection of the congregation with any other body, or to any future divisions, which might happen in the congregation; nor are there any means of ascertaining, to which of the parties, which now exist in that congregation, the testator would have adhered, if he had lived. Most probably, considering the times in which he lived, the free and liberal institutions of the government, under which he had been protected in his religious belief, and the tendency in all communities to divide into parties, one of which may prevail over the other for a longer or shorter time, he may have contemplated, that time, which witnesses changes in all things, might witness a change in that congregation, even in great and important matters, and took no pains to guard against such changes, by limiting, or clogging, the legacy with any conditions or stipulations, which should prevent the congregation from having the benefit of it at all times to come, while they had a pastor of their own choice. In relation to the argument, which has been drawn from the fact, that Mr. Nelson was a member of the congregation, while they adhered to the associate church, and that the legacy must be appropriated according to the rules of the church, of which he was a member, as it was constituted at the time of his death,—this position must receive the same answer, to wit, that the intention of the testator is sufficiently plain, and it is not necessary to revert to any source to ascertain that intent. It may be proper, in some cases of trust, to resort to the religious tenets of the founder, as *evidence*, when a breach of the trust is complained of, and when it is doubtful what was intended.

It could not, however, be tolerated in this country, to adopt, to their extent, the principles laid down in the case of *Attorney General* v. *Pearson*, 3 Mer. 411, and 7 Sim. 290, or the principles laid down by the Chancellor, Lord Lyndhurst, in *Attorney General* v. *Shore*, in a note to the latter case. The answer of the defendants in the former case contains reasons much more satisfactory to my mind, than the opinion of Lord Cottingham, or Lord Lyndhurst. No satisfactory answer was, or has been, given to the inquiry proposed by the counsel in that case, that, if the chancellor could decree what doctrine should not be taught, he might, with equal pro-

Smith *v.* Nelson.

priety, declare what doctrine should be taught. I apprehend it would not be a question of easy solution, on the doctrine of those cases, to determine what deviations from the creed of a founder of a charity for religious uses should be considered a violation of the trust. Most religious societies have been, at times, divided on questions arising out of their articles of faith, and have altered them in many particulars,—by some deemed unessential, and by others essential. The situation of our country, our constitutional provisions in relation to religious freedom, forbid, that the authority of those cases should be here recognized. In the present case, however, as I have already remarked, we see no reason to doubt, but that the testator might have adhered to either of the parties, which now divide this congregation; and there is nothing, either in the will, or the testimony, which can lead to any doubt, or uncertainty, as to his views.

There is still remaining a question of importance in this case, which has been elaborately argued, and to which the attention of the court has been directed, that is, whether, according to the rules of discipline of the associate church, Mr. Pringle has been properly suspended and deposed from the ministry. It seems to be necessary, that the court should decide this question, as it may be and has been claimed, that, if he is regularly deposed, the avails of the legacy in question ought either to be decreed to the minority adhering to the synod, or divided between those who adhere to him and those who adhere to the synod. The court approach this question with some diffidence, as we have not the aid of previous acquaintance with the rules of church government and discipline recognized in this denomination of christians and as the cases, which may be found in our English reports, have no relation to ecclesiastical organization and proceedings, as they exist in this country.

But examining the proceedings of the judicatories, which have been had in the case under consideration, by the rules applied to ecclesiastical courts in Great Britian, we should, without much hesitation, come to the conclusion, that the proceedings, which have been had in relation to the presbytery of Vermont and Mr. Pringle, are irregular, arbitrary and wholly void. To excommunication in England certain civil disabilities are attached. To aid in carrying into effect a sentence of excommunication, a writ *de ex-*

Smith *v.* Nelson.

*communicato capiendo* may issue out of chancery, which has been said by some to be a writ grantable *ex debito justitiæ*, by others *ex gratia.* This writ is said to be a liberty, or privilege, peculiar to the church of England, above all the realms of christendom, as being more sure and effectual, than any other aid of the secular power afforded elsewhere. When a person was taken and in custody on such writ, the regularity of the proceedings of the court passing such sentence might be inquired into on *habeas corpus ;* 1 Salk. 293 ; and the party be relieved, if the proceedings were irregular. In 12 Co. 76 it was held, that, if a man be excommunicated by the bishop *wrongfully and against law,* he shall have a writ out of chancery, directed to the bishop, commanding him to assoil him, that is, to release, or absolve him. In the case of *Beaurain* v. *Scott,* 3 Camp. 388, the defendant, as Vicar General of the Bishop of London, had excommunicated the plaintiff for not appearing as guardian *ad litem* to his son. For this excommunication an action was sustained against the defendant, notwithstanding he acted as judge of the ecclesiastical court, because the court had no authority to compel the plaintiff, against his will, to be guardian *ad litem,* and also for some irregularity in their proceedings. On these questions evidence was given, and the effect of the evidence left to the jury. In *Beaurain's Case,* 16 Vesey 346, the court of chancery sustained jurisdiction of a motion for a writ to issue to the bishop, commanding him to absolve a person, who had been excommunicated for a cause, for which, by the law, they had no authority to excommunicate. These cases show, that the proceedings of an ecclesiastical court in England may be examined into collaterally, and that the sentence of such court is not as conclusive, as has been claimed for the adjudications of the synod in this case.

The effect of the sentence of church courts, in cases evidently within their jurisdiction, has lately been much discussed in cases arising out of the acts of the General Assembly in Scotland. The Kirk is the established church of Scotland,—the jurisdiction of their judicatories was conceded, or confirmed, by act of the Scotish Parliament, at an early day, and was confirmed by the act of Union. If a person disobeyed their order, the aid of a civil court, the Lords of Sessions, might be obtained, *to put him to the horn.* Stewart of Pardovan 227. The decisions of these church courts like the

decisions in common law reports, form a body of ecclesiastical law, which would be recognized in the other courts. The collection of Stewart of Pardovan, so often referred to, like the writings of canonists, would be received as authority, probably, in those courts. These judicatories derive their authority through the acts of the civil legislature; and in this respect they stand on the same foundation, as the church in England. It was claimed for them, that their General Assembly was a superior co-ordinate ecclesiastical court,—that they had a right to judge absolutely and without control, and *exclusively*, on all subjects, which they held to be within their jurisdiction. Their claim, however, was rejected and entirely repudiated, both in England and by the courts of Scotland. In the case of the Presbytery of Auchterarder, which came before the Lords of the Sessions, and, on appeal, to the House of Lords, in 1839, the act of the presbytery, in rejecting a person presented to them to be ordained, in pursuance of what was termed the *veto act* of the General Assembly, was declared to be *ultra vires* and consequently void. In the Strathbogie case seven ministers were deposed by a presbytery, for having, among other things, applied to the civil courts for redress against an illegal and incompetent sentence of suspension, pronounced by the General Assembly; the seven deposed ministers instituted proceedings in the court of Sessions, to test the validity of this act of suspension. The power and jurisdiction of the ecclesiastical courts was much examined, and the claim to have their sentences ultimate and final, or, in the language of Lord Kames, " *in case of illegality* that sentence is ultimate," was declared to be exploded, and the court proceeded to examine the acts of the General Assembly, and pronounced them illegal and void, and afforded redress to the deposed ministers. Indeed, it is of the highest importance, that it should be so, and I can very cheerfully adopt the language made use of by the Lord President, " that the doctrine, that courts of the church may exercise co-ordinate jurisdiction with the superior courts of justice, is one of the great engines, by which the power of the papacy was upheld, and its spiritual despotism extended over Europe "—" the spiritual courts unite the legislative, judicial and executive functions,— the uncontrolled exercise of such a power would invest them with an authority the most irresistible and appalling, and consequently can never be tolerated in a free country."

These cases show, that the proceedings of an ecclesiastical court in England and Scotland may be inquired into collaterally, and that, when they proceed illegally, even those who pronounced their decrees are not exempt from responding for any damages, which an individual may sustain in consequence of their illegal acts. And surely, if the proceedings of an ecclesiastical tribunal, *known to the law*, may be a subject of inquiry in the courts of Great Britain and Scotland, and the parties injured may have redress in the civil courts by action, the proceedings of any self-constituted ecclesiastical tribunal, not recognized as a part of our jurisprudence, may be examined, disregarded and declared void, whenever the subject comes before our courts of law, whether directly or collaterally. The proceedings of the synod, or of any other ecclesiastical tribunal in this country, as a court of the last resort, are not to be held conclusive and absolute, when they come in question in courts of law. Notwithstanding, therefore, the synod has affirmed a decision deposing Dr. Bullions and others, dissolving the presbytery of Vermont, and suspending their ministers, the regularity and effect of their proceedings may be examined, and be determined in courts of justice, upon the same principles, which subject the proceedings, either of inferior courts, or voluntary associations, to inquiry and adjudication. A very respectable portion of the ministers of the associate church consider, that the presbytery of Cambridge have proceeded illegally and arbitrarily in relation to Dr. Bullions, and in relation to the presbytery of Vermont, and on that account have felt called on, as a matter of duty, to withdraw from them, or rather, to consider the synod as departing from the standards of the church. Their opinion on this subject is entitled to a respectful consideration.

1. As to the proceedings of the presbytery of Cambridge in their dealings with respect to Dr. Bullions, which was the origin of all this difficulty. We do not consider it necessary to examine this subject very critically, as it may not be necessarily involved in the decision of the question before us; but yet, as it laid the foundation for the subsequent proceedings, we cannot entirely pass it over. The case of Dr. Bullions is before the courts of a neighboring State; the vice chancellor has made a decision, and though that decision may not accord with our views, yet it is not expedient, that we should examine the grounds, on which he proceeded, with critical

Smith v. Nelson.

nicety. It is due, however, to those who judged those proceedings erroneous and have brought themselves into difficulty in consequence thereof, and whose conduct in that particular is questioned in this case, that we should not withhold our opinion. There appears to us to be a radical defect in the conduct of the members of that presbytery in the trial of Dr. Bullions, and such a departure from judicial propriety, as must render their acts invalid, and no action of the synod can make them valid. To any and every court there must be *actor, reus* and *judex*. If the judge becomes *actor*, or *reus*, it is plain there can be no impartial or regular judgment. In every trial for an offence, however trivial, the person accused is entitled to an impartial trial, by unbiassed judges, who have no hostility, or prejudice, against him, and whose judgment is unfettered by previous conceived opinion. This impartial trial by unprejudiced judges was not had in the case of Dr. Bullions ; but the rules of judicial propriety and fairness were wholly lost sight of by the presbytery.

It appears, that in October, 1837, the presbytery of Cambridge consisted of Rev. Messrs. Whyte, Stalker, Dr. Bullions, Anderson, Miller, A. Gordon, D. Gordon, Goodwillie and Pringle, nine in all, together with their ruling elders. At a meeting of that presbytery in October, 1837, at South Argyle, there were present Mr. Stalker, Dr. Bullions, A. Gordon, D. Gordon and Mr. Anderson. A complaint of Mr. Stalker against two members of the presbytery, viz. Rev. Messrs. Miller and Anderson, was heard. Dr. Bullions at that time made a remark, in which he insinuated, that some members present were unfit to sit in *any court*, or in *this court*, as understood by some of the members. In the course of their meeting Dr. Bullions may have made, and probably did make, some remarks and observations, which prudence would have required him to withhold. He was, by the moderator, silenced and deprived of the privilege of debate, and a censure of rebuke was voted against him,—three members of the presbytery not voting. The presbytery then voted, that the execution of the rebuke be postponed, until the sentence imposing silence be removed. After a recess they removed the sentence imposing silence, and proceeded to inflict the censure of rebuke,—to which Dr. Bullions refused to submit; and, as he had a right to do, he protested and· appealed to the synod ; and thereupon he was suspended. It appears, that the members, of whom Dr. Bul-

lions complained, were Messrs. Anderson, A. Gordon, D. Gordon and Miller, and the names were stated by him, before sentence was pronounced. At this meeting, these four ministers, together with Dr. Bullions and Mr. Stalker, were the only ministers present; and there were present four or five ruling elders. One of the ministers, Mr. Stalker, and two of the elders did not vote to censure Dr. Bullions; the only persons, then, who voted to censure and suspend him, were the four individuals, of whom he was accused of saying, that they were unfit to sit in court, and two of the ruling elders. It appears from their minutes, that the vote, on the resolution to suspend him, was six for, and two against. Dr. Bullions protested against this decision, appealed, &c. To me it appears there was a decided objection to the vote, as it was passed by the very men, as to whom the insinuation by Dr. Bullions was made, and whose feelings, it is to be supposed, were, on that account, hostile to him. A sentence of suspension, passed under such circumstances, cannot be said to be pronounced by impartial judges, and to be deserving of consideration as a valid and effectual sentence. I will not say they were *unfit* to sit in that court, but it was highly improper, that they should sit in the case of Dr. Bullions; and no verdict of a jury, or sentence of an inferior tribunal, rendered by men situated as they were, would be sustained in any court in this State.

The congregation of Cambridge, over which Dr. Bullions was pastor, it seems, was not satisfied with these proceedings, and petitioned the presbytery to take into consideration the affair of Dr. Bullions; and accordingly a *pro re nata* meeting was called, and held on the fourteenth of November, 1837, at which all the ministers of the presbytery were present, and seven or eight ruling elders. At this meeting, we learn from the testimony, there was a majority in favor of restoring Dr. Bullions, agreeably to the prayer of the petition of the congregation of Cambridge, and, but for a proceeding wholly unwarranted and unprecedented in a regular court of justice, would have done so. A resolution was proposed, that Messrs. Goodwillie and Pringle should not have a seat in the proceedings of that meeting, on the ground of affinity and *partiality*. To support the charge of partiality a most frivolous reason is offered. In order to carry this vote, it was attempted to exclude Mr. Whyte from voting, which failed. It was proposed to them to put the vote as to

Smith *v.* Nelson.

Messrs. Goodwillie and Pringle, separately, and this was denied, though it is apparent their cases were not alike. In my opinion, Mr. Goodwillie was not then related by affinity to Dr. Bullions. The question was put on the resolution jointly, and, by the casting vote of the moderator, Mr. Miller, before named, the resolution was carried. By the exclusion of Messrs. Goodwillie and Pringle a majority was obtained, and a vote was then taken to exclude Mr. Whyte, which was also carried. Mr. Anderson says in his deposition, that he made the motion to exclude Messrs. Goodwillie and Pringle; that the proceedings against Dr. Bullions arose out of his allegation that four persons were unfit to sit in any court; and those same four ministers voted to exclude and did accordingly exclude Messrs. Goodwillie and Pringle from voting on that trial. After these votes, thus excluding three members, it is easy to anticipate, that the vote would be against the prayer of the petition of the congregation of Cambridge, and against restoring Dr. Bullions. These proceedings appear to me to be wholly unwarrantable.

Whether affinity is good ground for excluding members of a church judicatory from sitting in any case is a question, about which the witnesses differ; and the practice has not been uniform. Stewart of Pardovan, p. 195, says, there may be a warrantable declinature against particular members, who are related by affinity. In the synod Mr. D. Goodwillie voted without objection, though standing in the same relation to Dr. Bullions as Mr. T. Goodwillie. But the objection should not proceed from the court, but from either the accuser, or defendant. Whatever may be said on the subject of Mr. Goodwillie's and Mr. Pringle's voting, the objections are stronger and more forcible against Messrs. Anderson, Miller, and the two Messrs. Gordon. However they may have satisfied themselves of the distinction between an informer and accuser, so as to justify them in voting in this case, the distinction is too subtle, if not jesuitical, to receive countenance here. They were truly *actor* and *judex*.

I have no hesitation in saying, that these proceedings, by which the minority transferred themselves into a majority, and that majority consisting of the persons against whose sitting in that case there were such strong and unanswerable objections, vitiate and render void the proceedings of the presbytery of Cambridge in relation to

71

Dr. Bullions. There is more similitude to the proceedings of parties to obtain political ascendency, than to the sanctity and deliberate judgment of an impartial judicial tribunal. In my opinion these proceedings and determinations in regard to Dr. Bullions were not warranted by the books of discipline of the associate church, are void, and none the less so, though they are confirmed by the synod, where, as we may reasonably suppose, parties would be formed on this very subject. If the other five members of the presbytery, including Dr. Bullions, had availed themselves of their ascendency, and on their own motion, and not at the request of the accused, voted to exclude the four members above mentioned, it would have been an unwarrantable and unjustifiable proceeding; but not more so than the exclusion of Messrs. Goodwillie, Pringle and Whyte. For Rev. Mr. Stalker's proceedings in this trial of Dr. Bullions, and the speech he delivered in his defence and against the presbytery, it appears, from the evidence filed in this case, that, by the same presbytery, he was deposed from the ministry at a subsequent sitting. The presbytery of Vermont would have been justified in treating Dr. Bullions as a regular minister from another presbytery and receiving him, as such, without inflicting any censure.

The proceedings in relation to the presbytery of Vermont are, in our opinion, still more unwarrantable. In examining them we must look, for the power of the synod, to the book of discipline marked K, established at Pittsburgh in June, 1817, as the only book then formally adopted by the Associate Synod. The *whole* power of the synod is stated in the fifth article. The book of discipline marked C C was not then in force, nor was it adopted until 1843, (Anderson's deposition,) after this suit was instituted and after the secession of the presbytery of Vermont. It is a principle of universal jurisprudence, that laws, civil and criminal, must be *prospective* and cannot be *retro-active*. *Dash* v. *Van Kleeck*, 7 Johns. 477. Hence, if an act is committed, which is not criminal by the existing laws, or which cannot be tried and adjudicated upon by reason of some defect in the organization or constitution of a judicial tribunal, or if an evil is of ever so great magnitude, yet, if, through defect of legal provision, or want of power, it cannot be reached by the existing laws, this defect cannot be aided by any legislative procedure whatever; and, if this is true of civil or criminal proceedings, it is

more necessary, that it should be so in any ecclesiastical proceedings,—more especially, as they have no other power, or authority, than what is voluntarily conceded to them.   The book of discipline adopted in 1843, marked C C, may be referred to in proceedings for things which may have transpired subsequent to its adoption, but not for any thing previous.

According to the conceded power of the synod to erect new presbyteries,—Book of Discipline (K) art. 5, p. 13,—in June, 1838, on the application of the presbytery of Cambridge, and not on the application of the members residing in Vermont, as testified to by Mr. Reid, a new presbytery was erected in Vermont, including all the ministers and elders residing within the bounds of the State of Vermont.   This decision of the synod was acquiesced in by the members residing in Vermont, and accordingly the presbytery was organized and constituted according to the forms, rules and regulations of the associate church.   This power of the synod to erect new presbyteries is rather a legislative than a judicial power, but one which the increase of the church may render necessary ; and accordingly it is conceded to them ; but no such power is given to dissolve a presbytery against their consent, and it is of so dangerous a·character, and so fatal to the freedom and independence of churches, as well as destructive of individual, freedom, that it ought not to be granted, or exercised.   It, in effect, enables the synod to exercise uncontrolled authority, and to do acts of the greatest injustice and oppression, without any possibility of redress.   If they can dissolve one presbytery, they may dissolve all but one.

Nothing but a clear and explicit grant of such a power could warrant any attempt to exercise it.   This grant is wanting in their adopted book of discipline ; and it will not do to found it on necessity, which is the tyrant's plea, or on the doctrine of development, or implied power, which has been made the ground of introducing great errors in other churches, both in faith, doctrine and discipline. The power given them of erecting new presbyteries was necessary and proper; but I cannot conceive that it implies a right to annihilate a presbytery, and transfer its members to the jurisdiction of another, with whom they might not be connected by State limits or cordiality of feeling.   It was well observed in the argument, that the Congress of the United States, who have power to admit new

states into the Union, might as well call a refractory State before them and annihilate and dissolve it, as for the synod to annihilate the presbytery of Vermont, and transfer its members to the presbytery of Cambridge, *ut agnem lupo committere.* The presbytery of Vermont may have proceeded illegally in restoring Dr. Bullions, while he resided without the territorial bounds of their jurisdiction, although I do not pretend to say, that territorial limits are always to be regarded in licensing to the ministry, or receiving a minister from another jurisdiction, or from a foreign one; and it is not necessary that I should investigate it here; but, if they exceeded their powers, the act was void, and Dr. Bullions remained as before.

By virtue of the authority in the synod " to redress whatever was done contrary to order," they might say, that this deed was null and void from the beginning, and if so, it did no hurt to any one. This, I apprehend, was all, which the synod was required to do in the case, in the absence of the presbytery of Vermont.

We consider, therefore, that the presbytery of Vermont have not been regularly dissolved by any power authorized so to do, and Mr. Pringle has not been lawfully deposed. There are other errors and improprieties in the proceedings of the synod which would prevent its having any binding obligation. Their resolution on the relevancy of the complaint, denouncing the act of the presbytery of Vermont as a solemn mockery, a violation of their ordination vows, &c., in terms of virulent and unmeasured severity, when the presbytery had no notice to appear, and when they were not present, was irregular and cannot be countenanced in any court of judicature, professing to do equal and impartial justice. The *impropriety* and *injustice* of their deciding on the relevancy of the libel, without the parties being heard, is too apparent to require any elucidation. A libel, like an indictment, involves necessarily a question of law, as well as a question of fact; of law, whether the acts done constitute an offence; of fact, whether the person accused has done those acts *with such an intent* as to render him guilty. On both these questions the accused may be heard; the Book of Discipline (K,) p. 47, is very explicit on this point, and those who are to try, must have the power to decide both. Any attempt to separate these questions, and abstract either from the tribunals who are to determine the guilt, or innocence, of the party accused, or to prejudge either, must meet

with a signal rebuke, as was the attempt made in the last century to separate the question of law and fact in courts of law on trials for libels. The right as well as the duty of a jury, to decide the law and fact in criminal cases, has been established unalterably, in my opinion, except by the legislature.

The synod, in 1839, when they adopted the resolutions in relation to the presbytery of Vermont, evidently lost sight of this plain principle of jurisprudence, that no person is to be condemned unheard; and, by prejudging the conduct of the presbytery and its members, rendered themselves incompetent to sit in judgment upon them. It was as palpable a departure from judicial usage, and as great an infringement of private right, to prejudge and determine the law of an individual case, as it would be to prejudge and determine the facts. The presbytery of Vermont, if they erred in their determination in relation to Dr. Bullions, may have acted on good motives and erred without any intention to be disorderly. The resolution condemned their acts as a contempt of the synod, as a solemn mockery, and attributed to them the intent to be disorderly, and, in effect, decided and declared their guilt and contumacy, without any trial. Their authority to sit as a court, after this, might, with the strictest propriety and according to the rules of justice, be declined.

The act of the synod in 1840, which was but a continuance of the proceedings of 1839, can stand upon no better foundation, and was in fact a necessary result from the former proceedings. I think proper to remark in relation to their farther acts, that I can find no authority for the appointing a commission to receive the submission of the presbytery of Vermont. It was transferring to this commission the duties and the powers which properly appertained to the synod only. A committee might be appointed to execute the decrees of the synod in some cases, as we learn from the book before mentioned, Stewart of Pardovan. Whether this commission was of the character required in that book, is more doubtful. There were, in this, committed to the commissioners, judicial and legislative powers,—that is, to call the presbytery of Vermont before them, and to restore or dissolve them, as they might judge proper; they of course were to judge, whether their submission was satisfactory, or not. This was a delegation of judicial authority, which, I appre-

hend, was not warranted by any known rules of discipline of the associate church. Neither do I find any authority in the synod to suspend, or depose, ministers, unless it be in a case, which comes before them by appeal,—when it is said they have authority to end the controversy. Here was no offence committed in the face of the synod ; the presbytery, or its ministers, had done an act declared by the synod to be null and void from the beginning,—whether from an error in judgment, or from bad motives, did not appear,—when the synod suspended them. Moreover, I think, from comparing the power of the presbytery, as found in the Book of Discipline (K,) art. 4, p. 11, with the article concerning process against ministers, art. 7, p. 53, that all proceedings against ministers must commence and be first determined by the presbytery, and that the synod has only appellate jurisdiction. If the book of discipline was not sufficient to meet a case, where all, or a major part, of the members of a presbytery were involved in a complaint, the synod might make provisions for such cases in future, but not to have any effect on the past. No action was had against Mr. Pringle in the presbytery. In every view, which we can take of the proceedings, we consider the act of the synod in dissolving the presbytery of Vermont, setting its members over to the jurisdiction of the Cambridge presbytery, suspending the ministers, and finally deposing them, by the presbytery of Cambridge, as void and inoperative from want of authority and from the irregularity of their proceedings, and that Mr. Pringle still remains a minister in regular standing, pastor of the congregation of Ryegate.

Whether the act of the presbyteries of Vermont and Albany, in the meeting which was held in Cambridge, in June, 1841, was expedient, or not, is not for us to determine. The synod had excluded and dissolved them. In no other way could they proceed. They could not compel the synod to receive them again. By thus forming a new association, they did not thereby forfeit their presbyterian character ; and the reasons for secession from the prevailing party in the associate synod are certainly powerful ; and the right thus to separate, acting according to the dictates of their own consciences, and on the principles of the word of God, cannot be questioned, when we remember the origin of the associate church, in 1733. To us, as a court of law, the synod, which met in Cambridge, in 1841,

was as legitimate a body, and as regular a church judicatory, as the synod, from which they were driven. It is fortunate in this country, that persons may thus separate without forfeiting any civil right.

As a result of the whole case, we come to the conclusion, that this legacy was for the benefit of the Associate Congregation of Ryegate ; that Mr. Pringle is their regular ordained minister, and has never been regularly deposed, or suspended, from the ministry, by any tribunal having authority so to do ; and that he has forfeited no right, or privileges, which he acquired by virtue of and in consequence of his ordination. The congregation of Ryegate are entitled to this legacy, the interest of which is to be appropriated for the support of their minister.

In the decision of this case we have endeavored to conform our decision to the principles of law, as they are applicable to our State. If we have recognized no ecclesiastical jurisdiction, it is because none such exists here ; and it certainly will contribute to our peace, that there is no such jurisdiction in this State. Every one is at liberty to regard Dr. Bullions and Mr. Pringle as regular or deposed ministers, may receive or refuse the ordinances of the Gospel from them, and may submit to or decline their spiritual character as pastors. We consider Mr. Pringle as the regular minister of the congregation of Ryegate, according to the laws of this State, and do not recognize the proceedings of any of the church judicatories, as dissolving that relation ; and while he and the majority of his society are united, no legitimate power, or authority, has been exercised, to sunder that connection. All the persons, who have been actors in the transactions, which we have been called upon to review, were probably actuated by good motives and a sincere desire to do their duty. Of those with whom we are acquainted, we know that they are sincere, devoted and pious men. The whole difficulty, which has been so disastrous in its consequences, both here and elsewhere, has arisen from the attempt to exercise an authority, where none is possessed ; to assume powers of a legislative and judicial character, which are not given ; and to claim for them attributes and effects, which can only belong to tribunals having a legal existence under the supreme power of the State, and which can in no way belong to any voluntary society or organization whetever. And, as is too often the case, when men feel power, though they have it not, they

forget right. Associations and societies become divided into parties and resort to any means, whether justifiable or not, to obtain an ascendency, and avail themselves of that ascendency, to bear down and annihilate all who do not submit to their authority. The various proceedings, upon which we have been called to animadvert, appear to have proceeded too much from a party ascendency, acquired by not the most laudable means. This view disposes of the material points, which are in controversy in this case, and entitles the orator to the relief prayed for.

There are, however, other objections, rather of a technical character, which have been urged, and which we must consider.

1. It is contended that the orator, as treasurer of the society, cannot maintain this bill; the bill, however, is brought for the benefit of the Associate Congregation of Ryegate, and in their behalf. We think any members of the congregation, in behalf of the whole, and particularly the treasurer, whose duty it is to receive and disburse the moneys appropriated for the support of their minister, may institute a suit in their behalf, if the suit is recognized by them. As this objection is only in the nature of a dilatory plea, we should not be disposed to decide against the orator at this time, when the parties have prepared themselves and been fully heard on the main subject in controversy. The interest of the legacy should of right have been paid to the treasurer of the congregation. If there were any difficulties, or doubts, on this part of the case, the decree might be so framed as to obviate them.

2. It is urged, that the legacy had been paid by the defendant, before the commencement of this suit, to the trustees authorized to receive it. We, however, find the fact to be otherwise. The interest, at all events, should have been paid by the defendant to the orator, as the treasurer of the congregation, the principal only to be paid to trustees. The trustees, to whom the payment was made, were not the trustees of the *Associate Congregation*, nor the persons designated in the will as the trustees, in whose hands the legacy was to be placed, but the trustees of another incorporated society. The legality of the election of these trustees of the *society* is more than doubtful. The society had become divided into parties, in relation to this subject in dispute. Before the appointment of trustees was made, there was a motion for an adjournment, which was nega-

tived by three or four votes at most; and it is manifest, that, at that time, several votes were received from persons, who had not become members. Of the thirteen persons who signed the articles on that day, who were opposed to Mr. Pringle, and who evidently were procured, to give a party ascendancy in the election of trustees, none had become members by signing the articles, when the question of adjournment was put; but for their votes, the meeting was adjourned by a majority of the then existing members. The court could not, with propriety, commit the execution of this trust, and permit the payment of the funds, to persons thus elected, and evidently hostile to those, for whose benefit it is to be secured. The legacy should be paid either to the trustees elected by the congregation on the 15th of February, 1843, or to others to be selected by the chancellor.

The decree of the chancellor is reversed, and a mandate will issue to him to enter up a decree according to these views.