ICinkead, J.
(sitting by designation of the Chief Justice.)
This action is probably the first of its kind.
It is brought by plaintiff, who was formerly a member of the David Miller Old Order Amish Mennonite Church, against seven preachers and bishops of the several churches located in eastern Holmes county. The Amishites constitute about one-third of the population of Holmes county; they have so improved that part of the county that it is a beautiful and most valuable and fertile part thereof. Their houses are substantially built alike, provision being made in all of them for a room large enough to accommodate church congregations of from a hundred and fifty to two hundred. Their church meetings are held in the houses in the winter, and in their commodious barns in the summer. Their churches are usually named after individuals, plaintiff herein having once been a member of David-Miller church. Their name is derived from Jacob Amen, a native of Switzerland in the 17th century, who was a preacher of the Mennonite denomination. Amen opposed abuses of the church erected by the sainted Menno Simon, the founder of the sect that still bears his -name.. Menno was a contemporary of *3 Luther. The Bible of Martin Luther, printed in the old German text, probably constitutes the library of each household.
These people are still intensely devoted to the-Confession of Faith, known as the Confession of Dortrecht, signed in the city of Eor-t, Holland, by the leading disciples of Menno Simon in the year 1622.. They are religiously opposed to -war which was .the cause of their leaving their native land. They settled in what is now Holmes county in 1811, fourteen years before the county was organized.
Their language is low German, the use of which they earnestly insist upon; it was with much difficulty that some of the witnesses were compelled to use English on the stand, even those who could speak it well. They were fearful that they might not properly express themselves in English, and that they might not be understood.
The complaint in this case is made against the defendant preachers and bishops for enforcing a rule of the church called “m'iting” or “meiden,” which is boycotting under our civil law. This as practiced under their Confession of Faith is based upon its provisions and their religious belief.
Several complaints were made against plaintiff; he was rather an obstreperous member according to old Amish conceptions. It is an ironclad rule that the orders and decrees of the preachers and bishops must be obeyed.
The evidence shows that Ginerich had a mind of his own, and that he was altogether too independent to suit the clans. He did not believe in the doctrine of “miting” or “meiden” or boycotting; he thought it wrong, and he clearly manifested his adverse attitude to this doctrine of the church.
He also broke over the rule of the sect concerning dress. “We have our rules, and they must be obeyed,” said one of the defendants in his testimony. Such is the attitude of the defendants as disclosed by the evidence. However, their position is one of sincerity and devotion. These people have lived lives of community recluses; they have not come in contact with the outer world or with the enlightenment and blessings of modern Christian civilization. They live among themselves and still *4 maintain their own peculiar customs; they do not take advantage of modern and enlightened educational advantages. They are allowed freedom and shelter under our constitutional liberty of conscience and religion, but cling to their mother tongue and their ancient customs. Their customs are such as to prevent their children from becoming educated like other. American citizens; their purpose is to keep their children in the path of ancient Amishites. This retardment of education and enlightened civilization is. probably due to the great liberality of our constitutional liberty and freedom, and our laxity in enforcing education according to American ideals.
The petition alleges that plaintiff was a member of one of the old order Amish churches, and that the seven defendants are preachers and bishops thereof. Plaintiff complains that defendants attempted to make a rule that if any member left the church a ban was to be placed on such member forbidding all members to trade with, work for, employ, eat at the same table, live with or in any manner have any business dealings or associate with such member placed under such ban. Plaintiff alleges that such rule failed of adoption; that demand nevertheless was made upon plaintiff to abide by such rule which he refused to do; that on account of his refusal defendants and certain members of their churches refused to deal with, or to sell goods or merchandise to plaintiff, work for or employ him, or to eat at the same table with him, or to mingle socially with him; but boycoted him under thereat of expulsion from their churches, as well as to boycott members of the churches who failed also to boycott plaintiff according to the orders of defendants.
On the contrary, plaintiff states that he severed his connection with the Miller church with the knowledge and consent of the defendants and the churches.
The evidence sustains the claim that plaintiff obtained the consent of the former preacher of the Miller church (now deceased) to leave the church. Plaintiff thereupon joined the Martinscreek church, which the evidence shows to be a much more liberal and advanced church, there being greater freedom to depart from the old customs.
*5 Plaintiff began to wear suspenders, claiming it to be essential to his comfort, but he was called to account by the Old Amish preachers. He did not yield to their demand, so this was one of the complaints made against him.
Plaintiff transferred his membership from the Martinscreek church to a newly organized one, called the Bunker’s Hill church. The members of this church may own automobiles and indulge in other modern things without fear of condemnation. Plaintiff claims that the Martinscreek church gave its consent to his withdrawal therefrom, he with others having organized the Bunker’s Hill church. But since the organization of this church and plaintiff’s membership therein, it is claimed that defendants have unlawfully and maliciously conspired to place and continue plaintiff under the ban of their churches; by reason of such ban plaintiff complains that a portion of the members of their churches, under threat of expulsion and of being placed under the ban and boycott, have unlawfully and maliciously refused to tra'de with, work for, employ, sell to, eat at the same table with plaintiff, or in any way to mingle socially or in a business manner with plaintiff.
Plaintiff complains that defendants have conspired to induce his wife to place him under the ban, to refuse to minister to, cohabit with, eat at the same family table with him, or to treat him as a dutiful and lawful wife.
He charges also that they have caused his daughter to boycott him and refuse to visit and eat with him, or to mingle with him in a social, family or business way.
The daughter evidently yielded to the orders and directions of defendants. She married since her father was placed under the ban; she could not have her wedding feast in her father’s home because neither she nor her husband, nor the wedding guests were permitted to eat at the same table with her father. The daughter has observed the orders of the preachers and bishops. On the witness stand she stated in effect that it was her father’s own fault, that he was thus in trouble, meaning his failure to comply with the orders of the preachers and bishops was the cause of his trouble. The father could not at *6 tend the wedding on account of the boycott; the daughter does not now go to her father’s home and eat with him, nor does the father go to his daughter’s home and eat with her. They have a few times visited each other; but now the daughter strictly complies with the church directions.
( None of the members of the other churches who are all farmers are permitted under the ban, or boycott, to help plaintiff ¡ thresh or do work for him.
Plaintiff alleges that defendants placed his brother Menno Ginerich under the ban and boycotted him because he refused to observe the ban and assisted plaintiff and ate with him.
Plaintiff is engaged in farm work in Berlin township, and is the owner of a farm of 131 acres and complains that by reason of the ban and boycott directed by defendants, his neighbors and friends have not assisted him on his farm as is usual and customary among farmers.
Plaintiff claims that he has been caused much mental and physical strain, worry, disturbance, pain, anguish and distress, and has been damaged in the sum of $10,00,0. He asks that defendants be permanently enjoined from continuing the ban or boycott against him, and from inducing others to boycott him or from interfering with him in his business or his social affairs with his neighbors and the members of the Old Order of Amish Mennonite Churches.
The pleading of defendants is a homespun answer, probably the product of defendants themselves. It is not signed by counsel. It sets forth the manner in which their members are taken into their church. It sets forth Article XVI of their Confession of Faith which is as follows:
“We also believe in and acknowledge the ban, or excommunication, a separation or spiritual punishment by the church, for the amendment, and not for the destruction, of offenders; so that what is pure may be separated from that which is impure. That is, if a person, after having been enlightened, and received into the communion of- the saints, does willfully or out of presumption, sin against God, or commit some other sin unto death; thereby falling into such unfruitful works of darkness that he *7 becomes separated from God, and is debarred from his kingdom —that such an one — when his works become manifest, and sufficiently known to the church — can not remain in the ‘congregation of the righteous; ’ but must, as an offensive member and open sinner, be excluded from the church ‘rebuked before all,’ and ‘ purged out as a leaven,1 and thus remain until his amendment, as an example and warning to others, and also that the church may be kept pure from such ‘spots’ and ‘blemishes’; s.o that not for the want of this, the name of the Lord be blasphemed, the church dishonored, and a stumbling-block thrown in the way of those ‘without,’ and finally, that the offender may not be condemned with the world, but that he may again be convinced of the error of his ways, and brought to repentance and amendment of life. Isaiah 50:2; I Cor. 5:5, 6, 12; I Timothy 5:20; II Cor. 13:10.
“Regarding the brotherly admonition, as also the instruction of the erring, we are to ‘give all diligence’ to watch over them, and exhort them in all meekness to the amendment of their ways (James 5:19, 20); and in case any should remain obstinate and unconverted, to reprove them as die case may require. In short, the c-hurch must ‘put away from among herself him that is wicked’ whether it be in doctrine or life.”
Article 17, the Shunning of Those Who are Expelled:
“As regards the withdrawing from or the shunning of, those who are expelled, we believe and confess, that if any one, whether it be through a wicked life or perverse doctrine — is so far fallen as to be separated from God, and consequently rebuked by, and expelled from, the church, he must also according to the doctrine of Christ and his Apostles, be shunned and avoided by all the members of the church (particularly by those to whom his misdeeds are known), whether it be in eating or drinking, or other such like social matters. In short, that we are to have nothing to do with him; so that we may not become defiled by intercourse with him, and partake of his sins; but that he may be made ashamed, be affected in his mind, convinced in his conscience and thereby induced to amend his ways. I Cor. 5: 9-11; Rom. 16:17; II Thess. 3:14;- Titus 3:10.
“That nevertheless, as well in shunning as in reproving such offender, such moderation and Christian discretion be used, that such shunning and reproof may not be condusive to his ruin, but be serviceable to his amendment. For should he be in need, hungry, thirsty, naked, sick or visited by some other affliction, we are in duty bound, according to the doctrine and practice of Christ and his Apostles, to render him aid and assistance, as *8 necessity may require; otherwise the shunning of him might be rather conclusive to his ruin than to his amendment. I Thess. 5:14.
‘' Therefore we must not treat such offenders as enemies, but exhort them as brethren, in order thereby to bring them to a knowledge of their sins and to repentance; so that they may again become reconciled to God and the church and be received and admitted into the same — thus exercising love towards them, as is becoming. II Thess. 3:15. ”
The references to the Bible consist of exhortations not to keep company with fornicators, or the covetous, or with idolaters, or extortioners, or a railer, or a drunkard, and not to eat with such ones; to avoid those who cause divisions and offenses contrary to doctrines; and to note the man who does not obey, and have no company with him, that he may be ashamed. Yet he must not be counted as an enemy, but is to be admonished as a brother, according to scriptural doctrine.
The answer of defendants states that after “plaintiff had neglected our church, he was placed under the ban.” It is alleged that special investigation was made by a special committee of the church, two bishops and one elder, which committee after full hearing of both sides, those who were not satisfied and those favoring the ban, sustained it.
The matter was submitted to the General Conference which it is alleged after full consideration approved all matters connected with plaintiff and discipline of the church.
Defendants deny the charge that they endeavored to pursuade the wife and daughter to boycott plaintiff, although they claimed that it would be right for the wife and daughter to shun a husband or father.
The answer concludes:
“We hereby beg the court for the freedom we and our forefathers have enjoyed heretofore under the government of our country, which we acknowledge as ministers of God. ’ ’
The rule of this sect is that the members thereof are not permited to resort to law for redress of grievances among themselves. Plaintiff has been placed under the ban for bringing this action.
*9 The question presented ior decision appears to be whether the rule of discipline which defendants have adopted, and put into effect against plaintiff, has violated a civil right.
We know that religious liberty is guaranteed by the Constitution; that legislative and judicial power does not extend to individual opinion or religious belief (Constitution Art. I, Section 7), but that it is left free to reach acts violative of social duties and obligations cognizable at law. Reynolds v. V. S., 98 U. S., 145, 164. Nor have the courts power to revise ordinary acts of church discipline or to pass upon controverted rights of membership. Gewin v. Church, 166 Ala., 345; 139 Am. St., 41; Hundley v. Collins, 131 Ala., 234; 90 Am. St., 33.
Upon questions of discipline arising under articles of faith, the decisions of the church are ordinarily final, and must be respected and enforced by courts, unless they violate the civil law. Krecker v. Shirey, 163 Pa. St., 354; 29 L. R. A., 476; Harrison v. Hoyle, 24 O. S., 254.
While decisions by the church body require individual voluntary obedience, still they are not effective against civil rights and obligations. Smith v. Nelson, 18 Vt., 511.
Questions qf church membership are purely ecclesiastical when no civil right is involved. Waller v. Howell, 45 N. Y. Supp., 790. Excommunication in exercise of the power of church discipline is valid when no civil right is violated. Nance v. Busby, 91 Tenn., 303, 15 L. R. A., 801; Jennings v. Scarborough, 56 N. J. L., 401.
Judicial interference is therefore warranted only when civil rights are involved and infringed by church action, or members of the church. The civil tribunal tries the civil right and nothing more. 100 Am. St., 714, Note.
Judicial tribunals may assume jurisdiction of church difficulties only when some church action and practice clearly infringes upon some civil right. The doctrines and rules of boycotting ordinarily can not have application to acts of a church or of its officers and members when designed to reach mere problems of discipline.
Plaintiff claims that he ceased to be a member of the David *10 Miller Church by consent of its preacher, while defendants claim otherwise; the evidence sustains the plaintiff’s claim. There was no church rule; the action of expulsion was taken either by the preacher or bishop, or both, and by a vote of the church members.
There can be no dispute concerning the fact of the excommunication of plaintiff from the Old Order of Amish Church, and the promulgation of the ban against him pursuant to the long established Confession of Faith as. above set forth. Plaintiff in his petition, however," claims that his éxeommunication was due to his leaving the church because of the action of the church body, while there is no denial of the claim by plaintiff that the preacher of the Miller Church gave consent to plaintiff’s withdrawal long before the act of excommunication. Neither is there any controversy or dispute concerning the facts and reasons for the acts of defendants in placing plaintiff under the ban of “miting” him on account of his leaving the church, 'and his opinion and conduct concerning his opposition of the doctrine of “miting” and his leaving the church and his joining another church.
The only remaining question, therefore, is whether the act of defendants in placing plaintiff under the ban and in “miting” him constitutes a violation of a private right guaranteed by the civil law.
The facts developed present a novel question of religious liberty. The defendants assert the right of religious liberty to apply their belief in their “Confession of Faith” rendered holy by its antiquity, and their consequent right to apply and enforce its doctrine literally.
On the other hand, under our constitutional guaranty plaintiff himself must be granted equal right to entertain whatever views he may hold respecting the doctrines of his faith and religion. He has the right to dress as he pleases; he has the right to wear suspenders, to own an automobile, and to be a modern citizen if he chooses.
Religious liberty or immunity is a double edged sword. Plaintiff is entitled to believe what he pleases, and he also has the *11 right to withdraw from a church and join another one if he pleases, especially in the absence of any rule to the contrary. If one does not believe in the doctrines of a church, he has the right to leave it and join another.
The court finds that there is in fact no question of church discipline presented by the evidence. ' According to the evidence plaintiff was “mited” by the seven defendants “in part for leaving the church” and “because he would not agree to mite anybody else,” and partly because he wore suspenders with rubber in them, and would not comply with the orders of the preachers and bishops. Nowhere does it appear that the preachers and bishops were given power to enforce their creed.
But plaintiff was “mited” after he left the Miller Church and while he was a member of the Martinsereek Church, and out of the jurisdiction of the seven defendants.
The court finds from the evidence that plaintiff ceased to be a member of the church under the control of the Old Order of Amishites, legally so far as appears by any rules of the church. The preacher of the Miller Church gave his consent; and the evidence fails to show that there was any rule that prohibited him from leaving the church by consent of the preacher, or that prescribed any rule.
The court finds from the evidence that the Martinsereek Church which plaintiff joined, and the Bunker Hill Church of which he is now a member, is not affiliated with defendants and their churches; that when plaintiff was admittedly put under the ban or boycott by order of defendants he was at the time not under the control or jurisdiction or not subject to the discipline of defendants, not being a member of any one of their churches.
The evidence fails to show any rule of discipline or any custom that gave defendants the right to exercise control over or to discipline plaintiff at the time of placing the ban upon him.
The evidence shows concerted action by all of the defendants in placing the ban or boycott; it shows that under the orders and directions of defendants all members under the control and discipline of defendants were bound to obey their orders for fear of themselves being subjected to a like ban.
*12 The evidence shows that the main reason for “miting” plaintiff was because it was claimed he had broken the rule of the church; that he would not “mite” anyone; that plaintiff had taken the position that he couldn’t stay in the church and “mite” anybody; so “we mited him because he wouldn’t mite any one else”; “that was the main thing for which we mited him”; he was “mited” “while he was a member of Martinscreek church.” (Testimony of Preacher 8. J. Mast.)
All defendants in their testimony admitted that they had directed the members of their church to “mite” plaintiff; they admitted that they had met together and “talked the matter over” and that they all acted in a concerted manner.
Defendants in their testimony concede that the members of their churches under the directions to “mite” plaintiff were bound to refuse to eat with him; bound not to work for him; that the rule was that even members of the family “can not eat with him at the same table; his daughter could not; couldn’t pass things at the table; wouldn’t sell to a ‘mited’ person.” “Wouldn’t let any of our men go and work for him all summer; wouldn’t let any member of the church work for” one who was under the ban; “he would tell any member not to work for one who was under the ban”; if one violated the order “I would examine into it, and if they wouldn’t quit, then we would ‘mite’ them. That’s the way we understand the word of God; it would be right for the wife to ‘mite’ the husband.” (Testimony of Noah P. Beaehey, Bishop). •
“Congregations were told' that if they would do as Eli did they would be mited, and if they refused to mite Eli they would be mited.” “Joseph (plaintiff’s brother) was mited,” and defendant Mast “Told the members of the church to ‘mite’ him because he refused to ‘mite’ his brother Eli.” (Testimony of defendant Mast.) “He was mited because he refused to accept the confession of faith,” said defendant Swartzentruber.
It must be concluded that in fact and law plaintiff was excommunicated and placed under the ban when he was not in fact a member of any of the defendants’ churches; when they had no jurisdiction over him. In the absence of any rule for *13 bidding a member to withdraw from the church with the consent of the “preacher,” it must follow that plaintiff, at the time the ban was placed on him, was beyond the jurisdiction of the defendants. Plaintiff was wholly within his rigljt when he withdrew for the reason that he did not believe in the doctrine of literal “shunning,” “miting” or “boycotting” members of the church by withdrawing all business and social intercourse from a “mited” member.
It is contended that there, is no evidence that any persons actually refused to work for plaintiff, when called upon to assist in harvesting. But what 'more is essential than the admissions of the defendants that their church members were told as a matter of church discipline that they were not permitted to have social or business intercourse with him ? Plaintiff knew full well how useless it would be to ask neighbors who were members of any of defendants’ churches to assist him in his threshing or other farm work. Two actual instances of refusal to have business intercoures are shown by the evidence because of the ban.
The civil wrong of boycotting is in nature passive, a let-alone policy; and this is the theory upon which plaintiff founds his cause; he claims that defendants have unlawfully instituted and for seven or eight years maintained a boycott by withdrawal of all business, intercourse with him.
The conditions and circumstances under which the doctrine of boycott originated have peculiar and pertinent application to the complaint in this case. The term had its origin in an incident that occurred in Ireland.
The eo-ealled doctrine of boycott had its origin under peculiar circumstances between landlord and tenant, the former being represented by an agent named Captain Boycott, who served notice upon the tenants of his principal — Lord Earne. The tenants in retaliation sent Captain Boycott to “Coventry” in a very thorough manner; Coventry is a town in Warwickshire, England; Webster thus defines the word Coventry: “to send to, to exclude, or to be excluded from society; or from the society to which one belongs.”
*14 Aii exposition of the origin and meaning of the term “Boycott” is found in State v. Glidden, 55 Conn., 46, 3 Am. St., 23 (1887).
“The word ‘boycotting’ is not easily defined. It is frequently spoken of as passive merely — a let-alone policy — a withdrawal of all business relations, intercourse and fellowship. ¥e may gather some idea of its real meaning, however, by a reference to the circumstances in which the word originated. Those circumstances are thus narrated by Mr. Justin McCarthy, an Irish gentleman of learning and ability, etc. In his work entitled ‘England under Gladstone,’ he says. ‘The strike was supported by a form of action, or rather inaction, which soon became historical. Captain Boycott was an Englishman, an agent of Lord Earne, and a farmer of Lough Mark, in the wild and beautiful district of Connemara. In his capacity as agent he served notice upon Lord Earne’s tenants, and the tenantry suddenly retaliated in a most unexpected way — by, in the language of schools and society, sending Captain Boycott to Coventry in a very thorough manner. The'population of the region for miles round resolved not to haPe anything to do with him. and, as far as they could. prevent it, 'not to allow any one else to have anything to do with him. His life appeared to be in danger; he had to claim police protection. His servants fled from him as servants flee from their masters in some plague-stricken Italian city. The awful sentence of excommunication could hardly have rendered him more helplessly alone for a time. No one would work for him; no one would supply him with food. He and his wife had to work in their own fields themselves, in most unpleasant imitation of Theocritan shepherds and shepherdesses, and play out their grim eclogue in their deserted fields with the shadow of the armed constabulary ever at their heels. The orangemen of the north heard of Captain Boycott and his sufferings, and the way in which he was holding his ground, and sent him down armed laborers from Ulster. To prevent civil war, the authorities had to send a force of soldiers and police to Lough Mark, and Captain Boycott’s harvests were brought in and his potatoes dug by armed Ulster laborers, guarded by the little army. If this is a correct picture, the thing we call a boycott originally signified violence. ’ ” See 18 L. R. Ir., 430.
The nature of the alleged wrong complained here is, “passive merely — a let-alone policy — a withdrawal of all business relations, intercourse and fellowship.”
*15 As under tbe circumstances wherein the legal wrong of boycott originated, so here, all members of the Older Order of Amish Mennonites in Holmes county — some six or seven thousand persons — “resolved to have nothing to. do with” plaintiff. And the defendants “as far as they could prevent it” resolved not to allow any of their church members to have business or social intercourse with plaintiff. As in the Captain Boycott case: no one would work for G-inerich; no one would furnish him food unless he was starving; no one would work in his fields; no one would assist him in harvesting; no one would have social intercourse with him. Plaintiff- was cut off from social intercourse from the whole population of Amishites in Holmes county; he was in a way denied freedom to exercise his individual rights, or individual liberty by the decree of the preachers and bishops forbidding the many thousands of his sect to deal with him, or to have social intercourse with him; he was placed under external restraint and compulsion. Defendants’ acts operated to deprive plaintiff of his right to have free and uninterrupted business intercourse with the thousands of Amishites in his community, which right is a valuable legal right.
The right to unrestricted enjoyment of the family relationships and full, uninterrupted pleasure and happiness derived therefrom is a personal right entitled to protection at law(° JAccording to the evidence the acts of defendants have resulted in serious interruption of and injury to these rights.
Carrying into effect the church doctrinal views conceiming the “shunning,” the avoidance and the admonition not to keep company, to the extent shown by the evidence in this case against one who does not believe in such dogmas, and who in the free exercise of his own religious liberty has properly and legally withdrawn from a- church adhering to such doctrine, constitutes not only an infringement upon plaintiff’s constitutional religious liberty, but is also in violation of his right of enjoyment of his right of the family relation, as well as his unrestricted right to free and uninterrupted business intercourse naturally incident to the particular business.
There can be no right or cause of action unless a legal right *16 is violated. There surely can be no denial that every member of society is possessed of: 1, the right of religious liberty, consisting of the right to believe what he pleases, and to withdraw from a church that maintains and literally enforces a doctrinal belief by concerted action in derogation of’his civil rights; 2, of the right of family relations and the natural inherent enjoyment thereof; and, 3, the right to unrestricted business intercourse and trade.
Concerning the legal phases of the first and third rights above named there can be no doubt. Concerning the second right named, viz: the family relation right, it may be truthfully contended that up to date no legal "mould” has been manufactured or prepared by means of which an injury to such right may be redressed.
But what right is more sacred than that a man shall not have his right to full enjoyment of the natural intercourse with his wife, his children and his brothers interfered with and cut off by fossilized religious doctrines and antiquated literal interpretation of portions of the Bible which make it compulsive upon wife, daughter and brother to literally shun the husband, father and brother because some strange and peculiar sect composed of Low Germans 397 years ago construed portions of the Bible as shown by Art. 16 of the Amish Confession of Faith. Some things become more precious by age, but the crude and unnatural conceptions as disclosed are in sharp conflict with modern legal civil rights, which tend to infringe upon inherent family and business life, and which harmonizes better with the views of his Satanic Majestey and his satellites or representatives on earth. Of course courts have nothing to do with men’s religious views howsoever antiquated, except when such .acts infringe civil right; all we need to state is that no religious views can be the means of infringing civil rights.
Up to date legal treatises and decisions have dealt with certain well-known classes of wrongs to family rights; no question like the present is found among the common law remedies. The wrong here complained of antedates the common law, taking us back to ancient Holland times nearly three hundred years ago, *17 so that we have a problem with which the courts of common law probably never dealt. The Amishites were particular where they settled; being opposed to war and the warring contentions in the Eastern world, they came to America, settling in Pennsylvania, and from thence came to Ohio.
In this case the natural ties between father and daughter were practically destroyed by force of three hundred year old Amishite Confession of Faith; not so great injury was done the relation of husband and wife and that between brothers. One brother, however, who stuck to plaintiff brought upon himself the ancient curse of the Mennonite ban. This serious and unjust interference with the family relations of the Ginerich family, especially in the case of the daughter, is due to the tyrannical imposition of ancient Biblical interpretations in contravention of the civil rights of plaintiff.
We come finally to the third right, viz: the unrestricted right to business intercourse and trade. This brings us to the boycott and secondary boycott. It is admitted by all the defendants that they declared a ban and boycott against plaintiff some seven, eight or nine years ago; they admit that they have directed and required the members of all their churches not to deal.with plaintiff; not to help or work for him, nor to have any kind of business dealings with him. They admit in evidence that they have given directions to all members of the churches to observe this ban, and that all of them are directed and required to boycott plaintiff, and that any of them who fails to heed this direction will be visited with a like penalty by direction of defendants in case he should fail to observe the order by having business dealings with plaintiff. It is therefore immaterial whether it be shown that there was any denial or refusal to serve or deal with plaintiff, because in the absence of such a showing the proof is conclusive that there has been a direct and secondary boycott according to the admissions of all the defendants. It would have been idle for plaintiff to have sought help of his neighbors whom he knew were bound to refuse to deal with him according to the directions of the defendants. The action of all the defendants was admittedly concerted, so that all the elements of boycotting are present..
*18 It is not necessary to discuss the modern cases of boycott between capital and labor; the doctrines are well defined and understood, and the general principles are applicable. This is a peculiar and typical case of a very unjust boycott wholly at discord with American ideals of civil law and civil justice.
Eeference may be made to some fundamental definitions.
A boycott is not unlawful unless attended by some unlawful act which in itself is illegal. It may be correctly used in the sense of the act of a combination of persons in refusing to have business dealings with another until another (the complainant) removes or ameliorates the conditions which are deemed inimical to the welfare of the members of this combination or some of them. 1 Words and Phrases, Second.Series, p. 489. It is a combination to cause a loss to one person by coercing others, against their will, to withdraw from him, their beneficial business intercourse; by threats to do so the combination will cause similar loss to them. Meier v. Spear, 96 Ark., 618, 32 L.R.A. (N.S.), 792.
To render the term boycott applicable to .the acts of defendants complained of by plaintiff, it would be essential that acts done resulted in injury to plaintiff’s beneficial business intercourse, or tended so to do. The acts of defendants did have such tendency and effect.
Boycott is a combination between persons to suspend or discontinue dealings or patronage with another person or persons because of refusal to comply with a request of him or them. The purpose is to constrain acquiescence or to force submission on the part of the individual who by noncompliance with the demand has rendered himself obnoxious to the immediate parties, and perhaps to their personal and fraternal associates. Anderson’s Law Dictionary.
The question finally is whether the order to mite, shun, or boycott plaintiff made by defendants as preachers and bishops of the Old Amish Mennonite Church, pursuant to the Confession of Faith above set forth, may be justified in law under a claim that it was promulgated and enforced by defendants pursuant to the religious belief and doctrine.embodied in the Confession of Faith.
*19 There can be no dispute that defendants ordered the ban pursuant to a religious belief, in good faith and without malice. The rule, however, is well established that while legislative and judicial bodies have no power of control over religious belief or opinion, still the court has full power and jurisdiction to deal with acts in clear violation of social duties or rights of persons.
Acts done in the name of religious belief or under the guise of religious liberty clearly subversive of public right and morals, or of individual civil right, may be controlled and prohibited by the judiciary. Evil acts dangerous to public and individual welfare, though sanctioned by religious concept may be forbidden, punished or prohibited. State v. Marble, 72 O. S., 21; Bloom v. Richards, 2 O. S., 387, 392.
“There is no legal authority to constrain belief, but no one can lawfully stretch his own liberty of action so as to interfere with that of his neighbors, or violate peace and good order. The whole criminal law (and civil law) might be practically superseded if, under pretext of liberty of conscience, the commission of crime is made a religious dogma. It is a fundamental condition of all liberty and necessary to civil society, that all men must exercise their rights in harmony, and must yield to such restrictions as are necessary to produce that result. ’ ’ Matter of Frazee, 63 Mich., 396, 6 Am. St., 310.
Courts may grant relief in civil actions where religious practices or acts done pursuant to a religious belief result in a plain infringement upon a right guaranteed by the rules of civil law. An individual or an organization of persons into a religious society founded upon religious faith, belief or doctrine can not in the practice thereof, pursuant to a general plan or concert of action, carry out or put into, effect a religious practice which results in clear infringement of a civil legal right guaranteed by civil law. Each citizen possesses the right to deal and trade with any and all persons interested in the same business. So here the defendants have no right to put into practice their religious belief that a member of one of their churches, who withdraws from the same because he can not accede to a particular belief, *20 shall be placed under a ban, mited or boycotted for a long period of time, or for the remainder of his life, unless he yields to the demands of the preachers, bishops, repents and asks forgiveness. This constitutes an unlawful interference with private right for which there can be no religious immunity. This in effect is a boycott which may be relieved against in equity.
The finding and judgment is in favor of plaintiff and against defendants.
An order may be drawn restraining and enjoining defendants from further carrying into effect the order to mite and boycott plaintiff in so far as the same affects his religious liberty, his family relations, and his right to trade and deal with any and all members of the Old Order of Amish Mennonite Church. The order may direct and require defendant not only to revoke their former order and direction to the members of their churches, but to mandatorily direct and require the members of their churches that it is no longer their duty to observe and carry out the boycott.
Belief by way of compensation in money is not allowed.
The costs are assessed against defendants.